**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

<table>
<tr><td>

EQUAL MEANS EQUAL, *et al.*,

        Plaintiffs,

  v.

DONALD J. TRUMP, in his official
capacity as President of the United States, *et al.*,

        Defendants.

</td><td>

Case No.: 1:25-cv-10806-WGY

</td></tr>
</table>

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

*/s/ Andrew Rising*
ANDREW J. RISING
LIAM C. HOLLAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Rm. 12520
Washington, D.C. 20005
Phone: (202) 514-0265
E-mail: andrew.j.rising@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

    I.      THE MILITARY SELECTIVE SERVICE ACT ...............................................2

    II.    THE EQUAL RIGHTS AMENDMENT ............................................................3

        A.      Procedures for Amending the Constitution ...........................................3

        B.      Proposal of the Equal Rights Amendment ............................................4

    III.   PROCEDURAL HISTORY ...............................................................................7

LEGAL STANDARDS ...............................................................................................................7

ARGUMENT ..............................................................................................................................8

    I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION .......................8

        A.      Fenore Lacks Standing ..........................................................................9

             1.      Fenore fails to allege a present or future injury .......................9

             2.      Fenore fails to allege a stigmatic injury .................................10

        B.      Equal Means Equal Lacks Standing ....................................................12

             1.      Equal Means Equal fails to demonstrate organizational standing .....12

             2.      Equal Means Equal fails to demonstrate associational standing ........13

        C.      Plaintiffs' ERA Claim is Foreclosed by *Coleman v. Miller*..................14

             1.      *Coleman* confirms Congress's exclusive authority over ratification deadlines ...............................................................15

             2.      States' ratification rescissions are nonjusticiable under *Coleman* .........15

    II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF ON THE MERITS.....16

        A.      Plaintiffs' Purported ERA Claim Fails to State A Claim...................16

        B.      Plaintiffs' Equal Protection Claim is Foreclosed by *Rostker* ............19

CONCLUSION..........................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Agostini v. Felton,*
521 U.S. 203 (1997) ............................................................................................................20

*Alamo v. Clay,*
137 F.3d 1366 (D.C. Cir. 1998) ........................................................................................11

*Allen v. Wright,*
468 U.S. 737 (1984) ...........................................................................................................11

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................................................7

*Baker v. Carr,*
369 U.S. 186 (1962) .......................................................................................................8, 14

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .............................................................................................................7

*Blum v. Holder,*
744 F.3d 790 (1st Cir. 2014) ...............................................................................................9

*Castro v. Scanlan,*
86 F.4th 947 (1st Cir. 2023) ..........................................................................................9, 10

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .............................................................................................................9

*Coleman v. Miller,*
307 U.S. 433 (1939) .....................................................................................................passim

*Corrie v. Caterpillar, Inc.,*
503 F.3d 974 (9th Cir. 2007) .............................................................................................16

*Dames & Moore v. Regan,*
453 U.S. 654 (1981) ...........................................................................................................18

*Diamond v. Charles,*
476 U.S. 54 (1986) .......................................................................................................11, 12

*Dillon v. Gloss,*
256 U.S. 368 (1921) ...................................................................................................4, 17, 18

*Doe v. Selective Serv. Sys.*,
   No. 23-CV-02403-JST, 2024 WL 4859089 (N.D. Cal. Nov. 20, 2024) .............................19

*Draper v. Healey*,
   827 F.3d 1 (1st Cir. 2016) .........................................................................................................13

*Elgin v. U.S. Dep't of Treasury*,
   641 F.3d 6 (1st Cir. 2011), *aff'd sub nom.*, 567 U.S. 1 (2012).............................................2, 19

*Equal Means Equal v. Dep't of Educ.*,
   450 F. Supp. 3d 1 (D. Mass. 2020)....................................................................................12, 13

*Equal Means Equal v. Ferriero*,
   478 F. Supp. 3d 105 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021) ....................6, 12, 13

*Equal Means Equal v. Ferriero*,
   3 F.4th 24 (1st Cir. 2021)..............................................................................................6, 7, 8, 9

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ...............................................................................................................8, 12

*Ferguson v. Idaho Dep't of Corr.*,
   No. 4:20-CV-00003-DCN, 2020 WL 1016447 (D. Idaho Mar. 2, 2020) ...............................16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ..................................................................................................................8

*García-Catalán v. United States*,
   734 F.3d 100 (1st Cir. 2013).....................................................................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................................................13

*Idaho v. Freeman*,
   529 F. Supp. 1107 (D. Idaho 1981) .........................................................................................5

*Illinois v. Ferriero*,
   60 F.4th 704 (D.C. Cir. 2023) ...........................................................................................*passim*

*Kerchner v. Obama*,
   612 F.3d 204 (3d Cir. 2010) ...................................................................................................11

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ..................................................................................................................7

*Lance v. Coffman*,
   549 U.S. 437 (2007) ................................................................................................................11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ....................................................................................................8, 9

*Lyman v. Baker,*
    954 F.3d 351 (1st Cir. 2020) .............................................................................................11

*Maldonado v. Fontanes,*
    568 F.3d 263 (1st Cir. 2009) ..............................................................................................8

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.,*
    682 F.3d 1 (1st Cir. 2012) ..................................................................................................19

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
    141 S. Ct. 1815 (2021) ................................................................................................19, 20

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
    969 F.3d 546 (5th Cir. 2020), *cert. denied,* 141 S. Ct. 1815 (2021) ..............................19, 20

*Nat'l Coal. for Men v. Selective Serv. Sys.,*
    No. CV-24-4016-AB, 2024 WL 5277137 (C.D. Cal. Nov. 20, 2024) ...............................19

*Nat'l Org. for Women, Inc. v. Idaho,*
    459 U.S. 809 (1982) ....................................................................................................5, 17

*Pocket Veto Case,*
    279 U.S. 655 (1929) ..........................................................................................................18

*Rodriguez de Quijas v. Shearson/Am. Express Inc.,*
    490 U.S. 477 (1989) ..........................................................................................................20

*Rostker v. Goldberg,*
    453 U.S. 57 (1981) ....................................................................................................*passim*

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ......................................................................................................14

*Schwartz v. Brodsky,*
    265 F. Supp. 2d 130 (D. Mass. 2003) ...............................................................................10

*SEC v. Tambone,*
    597 F.3d 436 (1st Cir. 2010) ...............................................................................................7

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ..........................................................................................................12

*Sinochem Int'l Co. v. Malay. Int'l Shipping,*
    549 U.S. 422 (2007) .............................................................................................................7

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ............................................................................................ 2

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................. 9, 13

*Taylor v. El Centro Coll.*,
  No. 3:21-CV-0999-D, 2022 WL 102611 (N.D. Tex. Jan. 10, 2022) ................16

*Town of Norwood v. FERC*,
  202 F.3d 392 (1st Cir. 2000)............................................................................13

*United States v. AVX Corp.*,
  962 F.2d 108 (1st Cir. 1992)...................................................................... 12, 14

*United States v. Sprague*,
  282 U.S. 716 (1931) ...........................................................................................3

*Valame v. Biden*,
  No. 23-CV-03018-NC, 2024 WL 251415 (N.D. Cal. Jan. 20, 2024) .......... 6, 16, 19

*Valentín v. Hosp. Bella Vista*,
  254 F.3d 358 (1st Cir. 2001)..............................................................................7

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
  454 U.S. 464 (1982) .........................................................................................11

*Virginia v. Ferriero*,
  525 F. Supp. 3d 36 (D.D.C. 2021), *aff'd sub nom.*, 60 F.4th 704 (D.C. Cir. 2023).................. 6, 17, 18

*Warth v. Seldin*,
  422 U.S. 490  (1975) ..........................................................................................9

*White v. Hart*,
  80 U.S. 646 (1871) .................................................................................... 15, 16

## CONSTITUTIONAL LAW

U.S. Const. amend. XVIII ............................................................................. 4, 18

U.S. Const. amend. XX.................................................................................. 4, 18

U.S. Const. amend. XXI................................................................................ 4, 18

U.S. Const. amend. XXII............................................................................... 4, 18

U.S. Const. art. III ..............................................................................................8

U.S. Const. art. V ...................................................................................................................3

**STATUTES**

1 U.S.C. § 112 ......................................................................................................................14

50 U.S.C. § 3802 ...............................................................................................................2, 8

50 U.S.C. § 3809 ...............................................................................................................2, 8

50 U.S.C. § 3811 ..................................................................................................................2

50 U.S.C. §§ 3801, *et seq.* ..................................................................................................2

NDAA for Fiscal Year 2017,
    Pub. L. No. 114-328, 130 Stat. 2000 (2016) ..................................................................3

**RULES**

Fed. R. Civ. P. 12 ............................................................................................................. 7, 10

**LEGISLATIVE MATERIALS**

H.R. 4350, 117th Cong. § 513 (2022) ..................................................................................3

H.R. Rep. No. 95-1405 (1978) ...........................................................................................15

H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) ....................................................4, 15, 18

H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) ........................................................ 4, 18

H.R.J. Res. 638, 95th Cong. (1978) ................................................................................5, 15

S. 2792, 117th Cong. § 511 (2022) ......................................................................................3

S. 2943, 114th Cong. § 591 (2016) ......................................................................................2

S. 4543, 117th Cong. § 521 (2023) ......................................................................................3

S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) ................................................................ 4, 18

S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020) ....................................................5, 16, 17

S.J. Res. 2, 54th Leg. (S.D. 1979) ........................................................................................5

S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017) ............................................................... 5, 16

S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) ............................................................... 4, 18

S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) .......................................................... 4, 18

S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) .......................................................... 4, 18

S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018) ................... 5, 16

## OTHER AUTHORITIES

Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT 29 (2016) ............................ 20

FY2023 NDAA: Selective Service and Draft Registration, Cong. Rsch. Serv. Insight, (Jan. 12, 2023),
    http://crsreports.congress.gov/product/pdf/IN/IN11973 ................................................ 3

House Armed Servs. Comm., Hearing on Recommendations of the National Commission on
    Military, National, and Public Service, 117th Cong., 1st Sess., YouTube (May 19, 2021),
    https://www.youtube.com/watch?v=N90tvUb6Fow&t=4229s ........................................ 3

Inspired to Serve, Executive Summary, The Final Report of the National Commission on
    Military, National, and Public Service (March 2020),
    https://docs.house.gov/meetings/AS/AS00/20210519/112680/HHRG-117-AS00-Wstate-
    HeckJ-20210519-SD001.pdf ............................................................................................ 3

OLC, *Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal
    Rights Amendment*, 46 Op. O.L.C., slip op. 3 (2022),
    https://www.justice.gov/d9/2022-11/2022-01-26-era.pdf .............................................. 5

OLC, *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C., slip op. 15 (2020),
    https://go.usa.gov/xtJ3J ............................................................................................ 4, 5

Senate Comm. on Armed Servs., FY25 NDAA Executive Summary (June 2024),
    https://perma.cc/V3T2-N379 ........................................................................................ 3

Senate Comm. on Armed Servs., Hearing on Final Recommendations and Report of the National
    Commission on Military, National, and Public Service, 117th Cong., 1st Sess. (Mar. 11, 2021),
    https://perma.cc/8UXP-JXCC ........................................................................................ 3

**INTRODUCTION**

The Constitution vests Congress and the Executive with broad discretion over military affairs, particularly with respect to the composition of the armed forces. Pursuant to that authority, in 1948 Congress enacted the Military Selective Service Act ("MSSA"), which requires men between the ages of 18 and 26 to register with the Selective Service System. Plaintiffs, Jacqueline Fenore and the nonprofit Equal Means Equal ("EME"), now argue that Congress's longstanding male registration requirement violates a proposed constitutional amendment, the Equal Rights Amendment (hereinafter "ERA"), and the Equal Protection component of the Fifth Amendment. Their claims implicate generalized policy grievances, not concrete and particularized injuries for purposes of Article III. Plaintiffs' principal legal theory also hinges on a premise no court has ever accepted: that the ERA was validly ratified and has become part of the U.S. Constitution. And the Supreme Court long ago foreclosed Plaintiffs' equal protection challenge in *Rostker v. Goldberg*, deferring to Congress' "broad constitutional power to raise and regulate armies and navies." 453 U.S. 57, 65 (1981). Plaintiffs' claims are thus foreclosed by controlling precedent in all respects and should be dismissed.

At the threshold, Plaintiffs' claims should be dismissed for lack of standing. Plaintiffs cannot demonstrate that they have suffered a legally cognizable injury that is fairly traceable to the MSSA. This is particularly true here because reaching the merits would force the judiciary to decide the constitutionality of an action taken by a co-equal branch of government and the standing inquiry is especially rigorous. The MSSA itself does not require Fenore or EME to take any action. To the contrary, their complaint is that the MSSA does *not* require women to register. But Plaintiffs do not connect Fenore's inability to register with any actual or imminent harm. And their theory of stigmatic harm fails to plausibly allege that the alleged stigmatization of nonregistration actually affects them in any way. Such claims fail to meet the burden of Article III.

Plaintiffs' claims also fail on the merits. It is undisputed that the ERA was not ratified by a sufficient number of states during the time period established by Congress, and the Supreme Court has long recognized such deadlines to be valid. For that reason, the Archivist of the United States has

not certified the ERA as an operative part of the Constitution, and every court to consider claims invoking the ERA has rejected them. The same result should obtain here.

Controlling precedent similarly forecloses Plaintiffs' equal protection claim, since the Supreme Court rejected an identical claim in *Rostker* and further declined the opportunity to overturn *Rostker* just four years ago. This Court is bound by this controlling precedent. Plaintiffs may disagree with *Rostker*'s holding and believe that it should be disregarded, but it is the Supreme "Court's prerogative alone to overrule one of its precedents," *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). *See Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 24 (1st Cir. 2011) (Stahl, J., concurring) ("[I]t would not be for this court to determine what, if any, impact these developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court."), *aff'd sub nom.*, 567 U.S. 1 (2012). This Court should therefore grant Defendants' motion and dismiss the Complaint in its entirety.

## BACKGROUND

### I.    THE MILITARY SELECTIVE SERVICE ACT

The MSSA, 50 U.S.C. §§ 3801, *et seq.*, requires male citizens and residents of the United States between the ages of 18 and 26, with certain exceptions, to register with the Selective Service System. 50 U.S.C. §§ 3802(a), 3809. Men who fail to register or otherwise comply with the MSSA and its implementing regulations may be subject to certain penalties and denied federal benefits. *Id.* §§ 3811(a), 3811(f). The MSSA does not require women to register. *See* 50 U.S.C. § 3802(a).

In 1980, President Carter recommended to Congress that the MSSA be extended to include a requirement to register women. *See Rostker*, 453 U.S. at 60. Congress declined after "consider[ing] the question at great length" with "extensive testimony and evidence." *Id.* at 61, 72. The next year, the Supreme Court rejected an equal protection challenge to the MSSA's male-only draft registration requirement, giving due deference to Congress's considered judgment that women could not assume combat roles in the military. *Id.* at 78-79.

Congress again considered male-only registration in the context of the 2017 National Defense Authorization Act ("NDAA"). The Senate version of that bill would have required women to register, S. 2943, 114th Cong. § 591 (as passed by Senate, June 21, 2016), but the law as enacted instead created

2

a commission to study the military Selective Service process to determine, among other questions, whether the process was needed at all and, if so, whether to conduct it "regardless of sex." NDAA for Fiscal Year 2017, Pub. L. No. 114-328, §§ 551, 555, 130 Stat. 2000, 2130, 2135 (2016). In its final report, issued March 25, 2020, the Commission recommended that both men and women be required to register with the Selective Service. *See* Inspired to Serve, Executive Summary, The Final Report of the National Commission on Military, National, and Public Service (March 2020), *available at* https://docs.house.gov/meetings/AS/AS00/20210519/112680/HHRG-117-AS00-Wstate-HeckJ-20210519-SD001.pdf. Congress has held hearings on the Commission's report,[1] and has considered multiple proposals to amend or repeal the MSSA to include women in recent years,[2] but has yet to change the MSSA's registration requirements.

## II.    THE EQUAL RIGHTS AMENDMENT

### A.    Procedures for Amending the Constitution

Article V of the Constitution provides that Congress may propose new amendments "whenever two thirds of both Houses shall deem it necessary[.]" U.S. Const. art. V. Article V further provides that an amendment "shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress." *Id.* The choice as to "the mode of ratification[] lies in the sole discretion of Congress[.]" *United States v. Sprague*, 282 U.S. 716, 730 (1931). In the exercise of that discretion, "Congress has specified the mode of ratification in the proposing clause included within every resolution proposing a constitutional

---

[1] *See* Senate Comm. on Armed Servs., Hearing on Final Recommendations and Report of the National Commission on Military, National, and Public Service, 117th Cong., 1st Sess. (Mar. 11, 2021), https://perma.cc/8UXP-JXCC; House Armed Servs. Comm., Hearing on Recommendations of the National Commission on Military, National, and Public Service, 117th Cong., 1st Sess., YouTube (May 19, 2021), https://www.youtube.com/watch?v=N90tvUb6Fow&t=4229s.

[2] *See, e.g.*, Senate Comm. on Armed Servs., FY25 NDAA Executive Summary (June 2024) at 3, available at https://perma.cc/V3T2-N379; FY2023 NDAA (S. 4543, 117th Cong. § 521); FY2023 NDAA: Selective Service and Draft Registration, Cong. Rsch. Serv. Insight, (Jan. 12, 2023), http://crsreports.congress.gov/product/pdf/IN/IN11973; FY2022 NDAA (H.R. 4350, 117th Cong. § 513 and S. 2792, 117th Cong. § 511).

amendment." *Ratification of the Equal Rights Amendment*, 44 Op. O.L.C., slip op. 15 (2020), https://go.usa.gov/xtJ3J ("2020 OLC Opinion"). Thus, for every Constitutional amendment ever adopted, Congress has dictated the mode of ratification (*i.e.,* by state legislatures or state conventions) in the proposing clause rather than in the text of the amendment itself. *See id.* at 14-15, 15 n.15 (collecting examples). As the Supreme Court has recognized, "[w]hether a definite period for ratification shall be fixed, so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification." *Dillon v. Gloss*, 256 U.S. 368, 376 (1921).

Congress has exercised its authority to impose a ratification deadline numerous times over the past hundred years. Although the early resolutions proposing amendments did not limit the time for ratification, *see, e.g.*, J. Res., 1st Cong., 1 Stat. 97 (1789), Congress included seven-year deadlines in the texts of what became the Eighteenth, Twentieth, Twenty-First, and Twenty-Second Amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2. When proposing the Twenty-Third Amendment in 1960, Congress included the ratification deadline in the proposing clause rather than in the text of the proposed amendment. *See* S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960). Since then, Congress has placed a deadline for ratification in the proposing clause of every constitutional amendment it has approved. *See* S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (proposed ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment).

## B.    Proposal of the Equal Rights Amendment

On March 23, 1972, both Houses of Congress adopted (by two-thirds majority) a joint resolution to submit the ERA to the state legislatures. 86 Stat. 1523 (1972). As it had done with respect to several prior proposed constitutional amendments, Congress imposed a seven-year deadline for ratification. The proposing clause stated that the amendment would become "part of the Constitution when ratified by the legislatures of three-fourths of the several States within seven years

from the date of its submission by the Congress[.]" *Id.* Within nine months, twenty-two states ratified the ERA. *Illinois v. Ferriero*, 60 F.4th 704, 712 (D.C. Cir. 2023). By 1977, thirty-five states had ratified the ERA, three states short of the thirty-eight needed to meet the threshold three-fourths of the fifty states as required by Article V. *Id.* However, between 1973 and 1978, four states—Nebraska, Tennessee, Idaho, and Kentucky—voted to rescind their ratifications of the ERA. *Id.*

On October 20, 1978, Congress extended the deadline for ratification by an additional three years to June 30, 1982. *See* H.R.J. Res. 638, 95th Cong. (1978). A group of states and individuals challenged this extension, arguing that Article V prohibited Congress from extending a ratification deadline, *see Idaho v. Freeman*, 529 F. Supp. 1107, 1153-54 (D. Idaho 1981), but litigation was rendered moot by the expiration of the deadline. *Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809 (1982). In the meantime, in 1979, South Dakota passed a resolution stating that its prior ratification expired after the seven-year deadline, unless three-fourths of the states ratified by that time. *Id.* (citing S.J. Res. 2, 54th Leg. (S.D. 1979)).

Thirty-six years after the amended ratification deadline expired, in 2018, Nevada voted to purportedly ratify the ERA. *See* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017). Shortly thereafter, Illinois and Virginia voted to purportedly ratify the proposed amendment. *See* S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess. (Va. 2020). After Virginia's vote, some states urged the Archivist of the United States to certify and publish the amendment as part of the Constitution. *See Ferriero*, 60 F.4th at 713. Other states sued the Archivist to block any such certification and publication. *See Alabama v. Ferriero*, No. 7:10-cv-2032 (N.D. Ala. Dec. 16, 2019). Facing these competing demands, the Archivist asked the U.S. Department of Justice's Office of Legal Counsel ("OLC") to determine the legal status of the ERA. OLC issued a formal opinion stating that the ERA "failed to secure the necessary ratifications within either of Congress's deadlines." 2020 OLC Opinion at 2.[3]

---

[3] OLC later clarified that "the 2020 OLC Opinion is not an obstacle either to Congress's ability to act with respect to ratification of the ERA or to judicial consideration of the pertinent questions." OLC, *Effect of 2020 OLC Opinion on Possible Congressional Action Regarding Ratification of the Equal Rights Footnote Cont'd.*

In 2020, Illinois, Nevada, and Virginia sued the Archivist of the United States seeking to compel the Archivist to certify and publish the ERA pursuant to Article V of the Constitution. *Virginia v. Ferriero*, 525 F. Supp. 3d 36 (D.D.C. 2021), *aff'd sub nom.*, 60 F.4th 704 (D.C. Cir. 2023). The district court dismissed the case for lack of jurisdiction. *Id.* The district court first held that the states lacked standing because they did not show that the Archivist's failure to certify and publish the ERA caused "a concrete injury that could be remedied by ordering him to act," *id.* at 45. The U.S. Court of Appeals for the D.C. Circuit affirmed dismissal of the suit. The D.C. Circuit also held that the plaintiff states were not entitled to mandamus relief because they had not established that the Archivist had a clear duty to certify and publish the ERA or that their right to relief was clear and indisputable, including because the states had not established that Congress lacked the authority to impose a time limit on ratification of the ERA or to place that time limit in the proposing clause of the ERA. *Ferriero*, 60 F.4th at 716-19. Individual and organizational plaintiffs, including EME, brought a similar lawsuit in this Court, which dismissed the case for lack of standing, a ruling the U.S. Court of Appeals for the First Circuit affirmed. *See Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 122 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021).

In 2023, a non-registered male sued the Selective Service System to challenge the constitutionality of the MSSA's male-only registration requirement on ERA and Equal Protection grounds identical to those raised by Plaintiffs here. *See Valame v. Biden*, No. 23-CV-03018-NC, 2024 WL 251415, at *1 (N.D. Cal. Jan. 20, 2024) (cited at Compl. ¶ 18, ECF No. 1). The district court dismissed the plaintiff's Equal Protection claim as foreclosed by *Rostker*, and dismissed his ERA claim on the grounds that plaintiffs "Cannot State a Claim Under a Non-Existent Amendment." *Id.* at *2 n.1, *3. Valame moved for an injunction halting enforcement of the MSSA pending appeal, which the Ninth Circuit denied. *See Valame v. Biden*, No. 24-369. His appeal of the district court's order dismissing his case is currently pending before the Ninth Circuit. *Id.*

---

*Amendment*, 46 Op. O.L.C., slip op. 3 (2022), https://www.justice.gov/d9/2022-11/2022-01-26-era.pdf ("2022 OLC Opinion").

6

III.    **PROCEDURAL HISTORY**

Plaintiffs EME, a nonprofit organization, and Jacqueline Fenore, a female between age 18 and 25, filed their complaint on April 3, 2025.  Compl. ¶¶ 2-3.  They allege that by not requiring females to register for selective service, the MSSA violates both the Equal Protection component of the Fifth Amendment and the proposed Equal Rights Amendment, which they refer to as the "Twenty-Eighth Amendment to the United States Constitution."  Compl. ¶ 7.  As noted above, this is not EME's first attempt to litigate the validity of the ERA in this district.  *See supra* 6.  This Court dismissed EME's prior complaint invoking the ERA for lack of standing.  *See Equal Means Equal*, 3 F.4th 24.

**<u>LEGAL STANDARDS</u>**

Plaintiffs' complaint should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  When a defendant raises the issue of subject matter jurisdiction, the court must resolve the jurisdictional issue before proceeding to the merits of the plaintiff's claims.  *See Sinochem Int'l Co. v. Malay. Int'l Shipping*, 549 U.S. 422, 430-31 (2007).  In reviewing a motion to dismiss for lack of subject matter jurisdiction, a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Thus, a court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears, and the plaintiff bears the burden of establishing that such jurisdiction exists.  *Id.*  The court's review under Rule 12(b)(1) is not restricted to the pleadings; rather, the court may review extrinsic evidence to address any factual issues that affect jurisdiction.  *See Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001) ("jurisdictional averments are entitled to no presumptive weight [and] the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties").

Defendants also move to dismiss for failure to state a claim. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Id.* at 442 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A court must

separate the well-pleaded facts from conclusory legal allegations and accept as true only the factual allegations. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). And "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (cleaned up).

## ARGUMENT

## I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION

Article III of the Constitution limits federal-court jurisdiction to "actual cases and controversies." *Equal Means Equal*, 3 F.4th at 27 (citing U.S. Const. art. III, § 2, cl. 1). "An actual case or controversy only exists if the plaintiff has demonstrated 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "By requiring the plaintiff to show an injury in fact, Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). "The burden on the plaintiff at the pleading stage is plausibly to allege that each of the requirements to establish standing has been met." *Equal Means Equal*, 3 F.4th at 28.

Plaintiffs here—a female and a nonprofit organization—are totally unregulated by the statute the challenge. The MSSA requires males, but not females, between the ages of 18 and 26 to register. 50 U.S.C. §§ 3802(a), 3809. When (as here) a plaintiff challenges the government's alleged "unlawful regulation (or lack of regulation) of *someone else*," standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation marks omitted). Here too the Court's standing inquiry should be

"especially rigorous" because "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Blum v. Holder*, 744 F.3d 790, 797 (1st Cir. 2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). This is so because, consistent with the bedrock principle of separation of powers, judging the constitutionality of executive or congressional action is "the gravest and most delicate duty that [courts are] called upon to perform." *Rostker*, 453 U.S. at 64.

Because Fenore cannot demonstrate that she has suffered a legally cognizable injury, she cannot meet the "injury in fact" requirement to establish standing. Nor can EME demonstrate that it has suffered the requisite injury to demonstrate standing to sue on its own behalf or on behalf of any of its unidentified members. *See Equal Means Equal*, 3 F.4th at 28-31. Even if Plaintiffs could establish Article III standing, their purported ERA claim would still be foreclosed by controlling precedent.

### A.    Fenore Lacks Standing

The first prong of the standing inquiry, "injury in fact," requires (1) an "invasion of a legally protected interest" that is (2) "concrete and particularized" and (3) "actual or imminent." *Lujan*, 504 U.S. at 560 (citations omitted). Demonstration of an injury in fact "is a hard floor of Article III jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). At their core, Plaintiffs' allegations raise general policy objections, not concrete and particularized injuries present, stigmatic, or future, and recourse for their policy objections lies with the political process, not in federal court.

#### 1.    Fenore fails to allege a present or future injury

Fenore fails to carry her burden to show that she has suffered a concrete and particularized injury caused by Defendants' actions. In the Complaint, Plaintiffs do not offer a single "specific, concrete fact[]" to show that the MSSA—or Defendants' administration of the Act—has caused or will cause Fenore personal, particularized, and cognizable injury. *Warth v. Seldin*, 422 U.S. 490, 508 (1975). Instead, the Complaint alleges merely that "Plaintiffs and all women are harmed because Defendants intentionally exclude women from Selective Service." Compl. ¶ 16. But that conclusory allegation of generalized harm common to "all women" falls far short of the requirement to demonstrate the existence of a particularized harm to Fenore herself. *Id. See Castro v. Scanlan*, 86 F.4th

947, 955 (1st Cir. 2023) (the case or controversy requirement "prevents a plaintiff from invoking the Article III jurisdiction of a federal court by asserting what is merely a 'general interest common to all members of the public.'" (citation omitted)).

At bottom, the MSSA does not harm Fenore by requiring her to do anything, nor deprive her of any opportunities in life. Because she is not required to register, she cannot be subject to criminal penalties, a loss of eligibility for federal or state jobs and education benefits, or the denial of a security clearance for failing to register. And Plaintiffs alleges no such deprivation in their Complaint. Nor would selective service registration allow Fenore to receive any additional benefits that would not otherwise be available to her. As Plaintiffs concede, Fenore remains free to enlist in the military (now or in the event the draft is reinstated). Compl. ¶ 15. The Complaint does not allege that if Fenore did enlist, her exemption from the registration requirement would hinder her career opportunities in the military or otherwise place her at any comparative disadvantage. As such, she has not alleged any injury sufficient to establish Article III standing.

In *Schwartz v. Brodsky*, this Court came to the same conclusion. 265 F. Supp. 2d 130 (D. Mass. 2003). There, four men and one woman brought a challenge to the MSSA claiming, as Plaintiffs contend here, that the factual underpinnings of *Rostker* had been weakened. *See id.* at 132. This Court dismissed the claims of all plaintiffs for failure to state a claim under Rule 12(b)(6), and also found that the female plaintiff lacked standing because individuals "who have never been registered with the Selective Service System and are not under any compulsion to register in the near future" suffered neither "distinct and palpable harm nor imminent threat of concrete harm . . . sufficient to establish standing" from the male-only registration requirement. *Id.* at 131 n.1 (citation omitted). That conclusion remains correct here.

### 2. Fenore fails to allege a stigmatic injury

Equally meritless is Plaintiffs' vague assertion that "Plaintiffs and all women have suffered stigmatic injury by the public perception that they are unworthy of registering for Selective Service." Compl. ¶ 17. Indeed, the plausibility of such a perception is undercut by the fact that "[w]omen today engage in combat in all military branches." *Id.* at ¶ 15. More importantly, stigmatic injury inflicted by

10

allegedly unconstitutional discrimination based on differential treatment requires that the differential treatment have some real, adverse consequence for the named plaintiff. *See Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (emphasizing that when the injury asserted is a "stigmatic injury," the requirement of *personal* injury takes on heightened importance); *see, e.g., id.* at 737, 755 (plaintiffs lacked standing to challenge tax exemption granted to school when injury was exemption's allegedly stigmatizing effect); *Alamo v. Clay*, 137 F.3d 1366, 1370 (D.C. Cir. 1998) (assertions of stigma insufficient when plaintiffs fail to allege "any detrimental consequences" from the stigma). No such personal and concrete injuries are (or can be) alleged by Plaintiffs here. Fenore does not allege that the purported stigmatization she attributes to the MSSA has impacted her in any way. *See id.* Having failed to allege that the MSSA has any effect—measurable or otherwise—on her activities or opportunities in life, Fenore has failed to carry her burden to establish standing.

Absent a particularized, concrete injury, Plaintiffs' complaint is akin to a policy grievance, unsuitable for resolution in federal court. *See Lance v. Coffman*, 549 U.S. 437, 440 (2007) ("To have standing, we observed, a plaintiff must have more than 'a general interest common to all members of the public.'" (citation omitted)); *Lyman v. Baker*, 954 F.3d 351, 361 (1st Cir. 2020) ("[i]njuries that are too 'widely shared' or are 'comparable to the common concern for obedience to the law'" are not particularized (citation omitted)). Plaintiffs concede as much in their Complaint, admitting that their concern is so generalized that it applies to "all women," Compl. ¶¶ 16-17; *see also id* ¶ 22 ("Plaintiffs here seek to assert a meaningful voice for women at this critical time of judicial decision-making regarding women's status under the United States Constitution."). Such "abstract questions of wide public significance" are "most appropriately addressed in the representative branches," not in federal court. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982) (citation omitted); *Kerchner v. Obama*, 612 F.3d 204, 208 (3d Cir. 2010) (same). Likewise, "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." *Valley Forge*, 454 U.S. at 483. Simply put, Article III "requires more than a desire to vindicate value interests." *Diamond v. Charles*, 476 U.S. 54, 66 (1986). Plaintiffs' "disagreement [with

the MSSA], however sharp and acrimonious . . . is insufficient by itself to meet Art. III's requirements." *Id.* At their core, Plaintiffs' allegations raise general policy objections, not particularized injuries present, stigmatic, or future, and recourse for their policy objections lies with the political process, not in federal court.

**B.    Equal Means Equal Lacks Standing**

1.    Equal Means Equal fails to demonstrate organizational standing

Similarly, EME lacks standing to sue, either on its own behalf or on behalf of its purported members.  An organization does not have standing to sue based on "a mere 'interest in a problem,' no matter how longstanding the interest and . . . how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  "[O]rganizations may have standing to sue on their own behalf for injuries they have sustained." *All. for Hippocratic Med.*, 602 U.S. at 393-94 (citation omitted).  "In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.*; *see also Equal Means Equal v. Dep't of Educ.*, 450 F. Supp. 3d 1, 7 (D. Mass. 2020) (dismissing EME for lack of organizational or associational standing).  Under this test, it is no easier for an organization to establish standing than it is for an individual. *All. for Hippocratic Med.*, 602 U.S. at 393-94.

EME alleges no injury sufficient to establish organizational standing to sue on its own behalf. At most, it alleges that it "is an organization that represents women, and advocates for women's equality," Compl. ¶ 1, and that it "has been a national leader in the fight for women's equality for many years." *Id.* ¶ 3.  But "an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" *Id.* at 394 (citations omitted); *see also United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992) ("[A] mere interest in an event— no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury.").  Tellingly, EME invoked similar interests as a basis for standing in another lawsuit regarding the ERA less than five years ago.  This court correctly rejected its argument then, and should do so again here. *See Equal Means Equal v. Ferriero*, 478 F. Supp.

3d at 122 ("[i]f these allegations were sufficient to claim standing, an organizational plaintiff would have standing anytime a defendant's action interfered with their organizational goal of advocacy. This is precisely the principle the Supreme Court rejected in *Sierra Club*[.]").

### 2. Equal Means Equal fails to demonstrate associational standing

Nor has EME established associational standing to sue on behalf of its members. An "organization may have [associational] standing if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the organization, and relief does not require the presence of the members in the suit." *Town of Norwood v. FERC*, 202 F.3d 392, 405–06 (1st Cir. 2000). "To satisfy this requirement, the association must, at the very least, 'identify a member who has suffered the requisite harm.'" *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (quoting *Summers*, 555 U.S. at 499).

At the outset, nowhere does the Complaint allege facts indicating that EME is an organization with members "possess[ing] all of the indicia of membership in an organization." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). Indeed, courts in this district have previously rejected EME's claims of associational standing on similar grounds. *See Equal Means Equal v. Dep't of Educ.*, 450 F. Supp. 3d at 6 (EME "allege[d] they have supporters who 'voluntarily associate themselves with EME,' but that is not sufficient to [support] standing."). Thus, "Equal Means Equal's failure to allege facts in this regard is alone fatal to its associational standing theory." *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d at 120.

Moreover, although EMS alleges that "[t]wo female members of EME whose ages are between 18 and 25 [unsuccessfully] attempted to register for Selective Service in March 2025," Compl. ¶ 12, those members lack standing in their own right for the same reasons that Fenore lacks standing. As explained above, an inability to register for the Selective Service does not amount to a present, future, or stigmatic injury for purposes of Article III. *See supra* 9-12; *Draper*, 827 F.3d at 3 (to secure associational standing, "the association must, at the very least, 'identify a member who has suffered the requisite harm.'" (quoting *Summers*, 555 U.S. at 499)). For all of the reasons stated, Plaintiffs have not demonstrated standing in this suit, and the Court should dismiss this suit for lack of jurisdiction.

*See AVX Corp.*, 962 F.2d at 113 (explaining that "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case").

    **C.**    **Plaintiffs' ERA Claim is Foreclosed by *Coleman v. Miller***

    Even if this Court were to find that Plaintiffs have adequately alleged standing under Article III, their ERA claim would still need to be dismissed under *Coleman v. Miller,* 307 U.S. 433 (1939). Plaintiffs' claim that the MSSA is unconstitutional because it violates the ERA derives from their assertion that the ERA is an operative part of the Constitution. Compl. ¶ 28. But the Complaint does not and cannot cite to any provision of the United States Statutes at Large—the official document that Congress directed must include "any amendments to the Constitution of the United States . . . ratified . . . pursuant to article V[,]" 1 U.S.C. § 112—including the provisions of the Equal Rights Amendment. Those "Statues at Large[,]" Congress directed, "shall be legal evidence of . . . ratified amendments to the Constitution of the United States therein contained, in all the courts of the United States[,]" including this one. *Id.*

    Rather, Plaintiffs seemingly anticipate "proving" that the ERA is a part of the Constitution as part of their claim that Defendants are violating it. Compl., ¶¶ 28-29. But Plaintiffs themselves acknowledge that there is "disagreement about the ERA's validity because its ratification deadline expired before the last state ratified," *id.* at ¶ 29, and several states have taken action to rescind their prior ratifications before Virginia's ratification in 2020. Accordingly, Plaintiffs' purported ERA claim necessarily requires this Court to (1) find that a deadline established by a supermajority of Congress for the ratification of a constitutional amendment is invalid, and (2) find invalid the actions taken by five states to rescind their prior ratifications. In *Coleman v. Miller,* 307 U.S. at 447–56, however, the Supreme Court confirmed Congress's exclusive authority in this area, and held that the question of "what effect a prior rejection had on a subsequent ratification, w[as] committed to congressional resolution and involved criteria of decision that necessarily escaped the judicial grasp." *Baker*, 369 U.S. at 214. Because Plaintiffs' claim that the ERA is valid necessarily requires the Court to address issues within Congress's exclusive authority under *Coleman*, this case must be dismissed. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494, 2508 (2019) (when a "claim is said to present a 'political question'

and to be nonjusticiable" the claim is "beyond the courts' jurisdiction" and the court must "dismiss [the case] for lack of jurisdiction.").

1.  *Coleman* confirms Congress's exclusive authority over ratification deadlines

To succeed on their ERA claim, Plaintiffs must demonstrate that the deadlines Congress imposed for states to ratify the ERA in 1972 and 1978 are invalid.  Compl. ¶ 29.  But under *Coleman,* "the question, what is a reasonable time [for ratification of a constitutional amendment], lies within the congressional province."   307 U.S. at 454.   Congress decided how much time to allot for ratification the ERA after considering "a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice[.]" *Coleman*, 307 U.S. at 453; *see* H.R. Rep. No. 95-1405, at 11 (1978).  Were this Court to accept Plaintiffs' invitation to hold Congress's deadline invalid, it would give this Court a pivotal role in the Amendment process, which Article V places in the hands of Congress.  *See id.* at 453. Indeed, to rule for the Plaintiffs, this Court would have to upend the last sixty years of constitutional amendments, during which time Congress has routinely set ratification deadlines in the same manner as the ERA.  *See supra* 4.  It is undisputed that Congress set a deadline for ratification of the ERA, *see* 86 Stat.  1523 (1972); H.R.J. Res. 638, 95th Cong. (1978).   This Court should defer to Congress's exclusive authority in this area.  *See Coleman*, 307 U.S. at 453-54.

2.  States' ratification rescissions are nonjusticiable under *Coleman*

In order to find that the ERA has been ratified by the required number of states, this Court must also find invalid the actions several states have taken over the years to rescind their prior ratifications.  If these rescissions were valid, only 33 states would have ratified the ERA (assuming, *arguendo*, that the post-deadline ratifications of Nevada, Illinois, and Virginia count), leaving the proposed amendment five states short of number needed for adoption.  *See supra* 5.  The Supreme Court has determined that this precise question is nonjusticiable.  As it explained, "in accordance with th[e] historic precedent" of the Fourteenth Amendment's ratification process, "the question of the efficacy of . . . attempted withdrawal [of a state's prior ratification], should be regarded as a political question pertaining to the political departments[.]"  *Coleman*, 307 U.S. at 450; *see also White v. Hart*, 80

U.S. 646, 649 (1871) (A state's "den[ial] [of] the validity of her ratification of [a] constitutional amendment[]" presents a case that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it").  Because under *Coleman*, this Court has no jurisdiction to decide the validity of the rescissions, the Court necessarily must dismiss Plaintiffs' ERA claim.  *Coleman*, 307 U.S. at 450; *see also Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 980 (9th Cir. 2007) ("the presence of a political question deprives a court of subject matter jurisdiction").

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF ON THE MERITS

### A.    Plaintiffs' Purported ERA Claim Fails to State a Claim

Plaintiffs argue that the MSSA's male-only registration requirement is contrary to the ERA, which they claim was ratified as the 28th Amendment to the Constitution on January 27, 2020.  Compl. ¶ 28.  This claim fails because the ERA is not part of the Constitution; its ratification deadline expired without a sufficient number of states ratifying it, and Congress has taken no action to extend that deadline since.  Plaintiffs point to no authority compelling a different result.  Indeed, every court to have considered the question has held that the ERA has no effect.  *See, e.g., Valame*, 2024 WL 251415, at *3 ("there is now no 28th Amendment and [plaintiff] cannot state a claim for relief under a constitutional amendment that does not exist"); *Taylor v. El Centro Coll.*, No. 3:21-CV-0999-D, 2022 WL 102611, at *8 (N.D. Tex. Jan. 10, 2022) ("[plaintiff]'s claim under the Equal Rights Amendment fails because there is no such amendment to the United States Constitution."); *Ferguson v. Idaho Dep't of Corr.*, No. 4:20-CV-00003-DCN, 2020 WL 1016447, at *1 n.1 (D. Idaho Mar. 2, 2020) (holding that the ERA is not part of the United States Constitution); *Ferriero*, 60 F.4th at 716-19 (Archivist did not have a duty to certify and publish the ERA because the deadline for ratification imposed by Congress was properly imposed in the proposing clause for the Amendment, and the deadline had lapsed).

Congress has twice set deadlines for ratification of the ERA:  first when it originally proposed the amendment to the states, and again in a subsequent joint resolution.  *See supra* 4-5.  But of the 38 ratification actions that Plaintiffs rely on to support their claim, Compl. ¶ 28, three were taken after both deadlines set by Congress had passed, *see* S.J. Res. 2, 79th Leg., Reg. Sess. (Nev. 2017); S.J. Res. Const. Amend. 0004, 100th Gen. Assemb. Reg. Sess. (Ill. 2018); S.J. Res. 1, Gen. Assemb., Reg. Sess.

(Va. 2020), and five others have rescinded.  "To prevail, then, Plaintiffs must show: (1) that th[ose] three ratifications count; and (2) that the rescissions of five other states do not."  *Ferriero*, 525 F. Supp. 3d at 55.  They cannot do so.  It is well established that Congress has the power to establish ratification deadlines, so the purported ratifications of Nevada, Illinois, and Virginia came too late to count.  The ERA thus failed adoption regardless of whether the actions taken by five other states to rescind their prior ratifications were valid.

The Supreme Court long ago recognized "the power of Congress . . . to fix a definite period for the ratification" of proposed amendments, *Dillon*, 256 U.S. at 375-76;  *see id.* at 376 (finding "no doubt" as to Congress's power to set such a time limit "as an incident of its power to designate the mode of ratification"); *see also Coleman*, 307 U.S. at 452;  *Ferriero*, 60 F.4th at 716-19.  And it is indisputable that Nevada, Illinois, and Virginia only purported to ratify the proposed amendment *after* the expiration of Congress' valid deadline.

That the deadline is valid is reflected in the litigation challenging Congress's extension of the ERA's deadline.  While the case was pending in the Supreme Court, the extended deadline expired and the Solicitor General urged the Court to dismiss the case as moot because "the Amendment has failed of adoption no matter what the resolution of the legal issues presented."  Mem. for the Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, Nos. 81-1282 *et al.* (July 9, 1982).  The Supreme Court agreed.  *Nat'l Org. for Women*, 459 U.S. at 809.  As the district court in *Virginia v. Ferriero* recognized, "[i]f the deadline was ineffective, a live controversy would have remained because additional states' ratifications could have still pushed the ERA past the three-fourths threshold."  525 F. Supp. 3d at 59.

In the face of *Dillon* and cases like it, Plaintiffs merely allege that some "believe the ERA is valid because the deadline is unconstitutional," citing statements by former-President Biden, Senator Gillibrand, the American Bar Association, and two law professors to that effect, as well as a failed House Joint Resolution to remove the ratification deadline.  Compl. ¶ 29 n.1.  But mere "belie[f] [that] the ERA is valid" cannot overcome controlling Supreme Court precedent to the contrary.  *Id.* at ¶ 29. *See Dillon*, 256 U.S. at 376 (finding "no doubt" as to Congress's power to set a time limit "as an incident

of its power to designate the mode of ratification"); *Coleman*, 307 U.S. at 452; *Ferriero*, 60 F.4th at 716-19 (citing *Dillon* and *Coleman*).

Nor can Plaintiffs' theory be squared with Congress's actions, as Congress has proposed a time limit for every constitutional amendment over the last 100 years, and has placed deadlines for ratification in the proposing clause of amendments for the past sixty years, just as it did for the ERA. *See supra* 4; *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."); *see also Dames & Moore v. Regan*, 453 U.S. 654, 684 (1981) (relying on historical practice of less than 40 years). Accepting Plaintiffs' argument would thus deprive Congress of an authority that it has long exercised pursuant to Article V for every amendment proposed in modern history: the power to include ratification instructions, including a deadline for ratification, as conditions of the States' ratification of proposed amendments. *See* U.S. Const. amends. XVIII, § 3; XX, § 6; XXI, § 3; XXII, § 2; S.J. Res. 39, 86th Cong., 74 Stat. 1057 (1960) (Twenty-Third Amendment); S.J. Res. 29, 87th Cong., 76 Stat. 1259 (1962) (Twenty-Fourth Amendment); S.J. Res. 1, 89th Cong., 79 Stat. 1327 (1965) (Twenty-Fifth Amendment); S.J. Res. 7, 92d Cong., 85 Stat. 825 (1971) (Twenty-Sixth Amendment); H.R.J. Res. 208, 92d Cong., 86 Stat. 1523 (1972) (proposed ERA); H.R.J. Res. 554, 95th Cong., 92 Stat. 3795 (1978) (proposed D.C. Congressional Representation Amendment). Accordingly, because "Congress set deadlines for ratifying the ERA that expired long ago," the final three ratifications alleged by Plaintiffs "came too late to count" for purposes of ratification, so the ERA cannot serve as a vehicle for Plaintiffs' claim regardless of whether the attempted rescissions of five other states were valid. *Ferriero*, 525 F. Supp. 3d at 40.[4]

---

[4] Like the district court in *Ferriero*, this Court need not reach the issue of whether Nebraska, Tennessee, Idaho, Kentucky, and South Dakota validly rescinded their prior ratifications of the ERA in order to grant Defendants' motion to dismiss, because Congress's well-established power to set a deadline for ratification independently forecloses Plaintiff's claims. *See* 525 F. Supp. 3d at 46. But in order to find that the ERA is part of the Constitution as Plaintiffs claim, this Court would need to invalidate these States' rescissions, which presents a nonjusticiable political question. *See supra* 15-16.

**B.      Plaintiffs' Equal Protection Claim is Foreclosed by *Rostker***

Plaintiffs also raise an Equal Protection challenge to the MSSA, but they acknowledge that this claim is foreclosed by binding Supreme Court precedent. *See* Compl. ¶ 13. (conceding that "the Supreme Court has previously ruled that it is not unconstitutional under the Fifth Amendment to deny women the opportunity to register for Selective Service."). Plaintiffs' claim that the MSSA violates equal protection is indeed foreclosed by *Rostker*. Federal courts have consistently rejected such claims in the years since. *See, e.g.*, *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 548 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1815 (2021); *Valame*, 2024 WL 251415, at *2 n.1; *Nat'l Coal. for Men v. Selective Serv. Sys.*, No. CV-24-4016-AB, 2024 WL 5277137, at *4-5 (C.D. Cal. Nov. 20, 2024); *Doe v. Selective Serv. Sys.*, No. 23-CV-02403-JST, 2024 WL 4859089, at *4-5 (N.D. Cal. Nov. 20, 2024). *See also Elgin*, 641 F.3d at 24 (Stahl, J., concurring) ("[I]t would not be for this court to determine what, if any, impact these developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court."). Just four years ago, the Supreme Court declined an opportunity to "overrule *Roskter*" in deference to Congress's continued consideration of draft registration. *Nat'l Coal. For Men,* 141 S. Ct. at 1816. Accordingly, Plaintiffs' Equal Protection claim fails to state a claim upon which relief can be granted.

In an attempt to circumvent *Rostker*, Plaintiffs suggest that "*Rostker* is no longer good law because it was decided under a judicial review standard of intermediate scrutiny"—a level scrutiny that they contend "subjects females to unequal protection of the laws[.]" Compl. ¶ 14. But even if *Rostker* were applying intermediate scrutiny, which it was not, *see Rostker*, 453 U.S at 70, 81-83 (refusing to label the applicable level of scrutiny as heightened scrutiny and applying a standard closely resembling rational basis review), intermediate scrutiny remains the standard applicable to gender classification claims today. *See Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 (1st Cir. 2012) ("Gender-based classifications invoke intermediate scrutiny"). Plaintiffs' observation that "*Rostker* was decided at a time when women were forbidden to engage in combat" does not change the level of scrutiny. Compl. ¶ 15. Indeed, in *National Coalition for Men*, while Justice Sotomayor, joined by Justice Breyer and Justice Kavanaugh, similarly observed that "[t]he role of women in the military has

changed dramatically since [*Rostker*]," 141 S. Ct. at 1816, the Court denied certiorari all the same in light of Congress's continued consideration of the issue and  the "longstanding deference to Congress on matters of national defense and military affairs."  *Id.*

In any event, it is well established that lower courts are bound to follow Supreme Court precedent even when the underpinnings of a decision have been called into question by factual and legal changes, and must "leav[e] to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express Inc.*, 490 U.S. 477, 484 (1989). *See also Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[W]e do not hold[] that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT 29 (2016) ("Lower courts are bound even by old and crumbling high-court precedent—until the high court itself changes direction.").  The Fifth Circuit recognized as much in *National Coalition for Men*.  In reversing a district court order that had concluded *Rostker* was distinguishable in light of changes in military policy, the Fifth Circuit explained that the district court was not empowered to "ignore a decision from the Supreme Court unless directed to do so by the Court itself."  *Nat'l Coal. for Men*, 969 F.3d at 549 (citation omitted).  The Fifth Circuit further noted that *Rostker* also "deferr[ed] to Congress's determination that the administrative and operational burdens of [expanding the draft to include women] exceeded the utility," which Plaintiffs here fail to address in their Complaint.  *Id.* at 549 (citing *Rostker*, 453 U.S. at 81-82).  It is therefore appropriate to reject Plaintiffs' Fifth Amendment Equal Protection challenge under *Rostker* without need for further inquiry.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion and dismiss Plaintiffs' Complaint in its entirety.

Dated: June 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

/s/ Andrew Rising
ANDREW J. RISING
LIAM C. HOLLAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Rm. 12520
Washington, D.C. 20005
Phone:   (202) 514-0265
E-mail:   andrew.j.rising@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I have filed this Memorandum with the Court's ECF system, which sends notice to Plaintiffs' Counsel identified on the NEF.

/s/ Andrew Rising
ANDREW J. RISING
Trial Attorney