## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **EQUAL MEANS EQUAL;** <br> **HEROICA FOUNDATION;** <br> **JACQUELINE FENORE,** <br> **individually and on behalf of** <br> **others similarly situated** <br><br> **Plaintiffs,** <br><br> **DONALD J. TRUMP, in his official** <br> **capacity as President of the United** <br> **States; CRAIG BROWN, in his** <br> **official capacity as acting director of** <br> **the SELECTIVE SERVICE** <br> **SYSTEM; SELECTIVE SERVICE** <br> **SYSTEM** <br> **Defendants.** | **Civil Action No. 1:25-cv-10806** |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**WENDY MURPHY**
**Women's and Children's Advocacy**
    **Project**
**New England Law | Boston**
**154 Stuart Street**
**Boston, MA 02116**
**617-422-7410**
**MA BBO#550455**
**Wmurphy@nesl.edu**

# TABLE OF CONTENTS

**INTRODUCTION** ……………………………………………..………..1

**LEGAL STANDARD** …………………………..…………………………........1

**FACTS** …………………………………………………………………........1

**ARGUMENT**…………..……………………………………..……………….2

    **I.**    **THE ERA IS THE TWENTY-EIGHTH AMENDMENT** ...……………..2

        **a. The Deadline is Per Se Invalid** …………..………………………3

        **b. The Deadline is Invalid Because it is in the Preamble**……………5

    **II.**    **STATES CANNOT RESCIND RATIFICATIONS**……………………........8

    **III.**    **BECAUSE THE ERA IS VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW**………….………..…....10

    **IV.**    **EVEN IF THE ERA IS NOT VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW UNDER THE FIFTH AMENDMENT**…………………………………………………12

    **V.**    **THE MSSA IS UNCONSTITUTIONAL UNDER STRICT SCRUTINY** ..................................................................14

    **VI.**    **PLAINTIFFS HAVE STANDING** …………………………………16

        **a. Discriminatory Exclusion** ………….………………………15

        **b. Stigma and Stereotype** ……………….........................……16

        **c. Denial of Equal Opportunity to Participate in Civic Life** ……….17

        **d. Equal Means Equal and Heroica Foundation Have Standing**……19

**CONCLUSION** ……………………………………………………….…....20

# Table of Authorities

## Cases

*Ableman v. Booth*,
    62 U.S. 514 (1859)………………………………………………………..12

*Ableman v. Booth*,
    11 Wis. 501 (1859)………………………………………………………..12

*Arver v. U.S.*,
    245 U.S. 366 (1918)…………………………………………………………17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)…………………………………………………………...1

*Brzonkala v. Virginia Polytechnic Institute and State University*,
    132 F.3d 949 (4th Cir. 1997) …………………………………...………13

*Carter v. Jury Commissioner*,
    396 U.S. 320 (1970)………………………………………………….……..15, 17

*Coleman v. Miller*,
    307 U.S. 433 (1939)……………………………………………………...2, 3

*Craig v. Boren*,
    429 U.S. 190 (1976)……………………………………………...……… 12, 13

*Dillon v. Gloss*,
    256 U.S. 368 (1921)………………………………………………….……..2, 3, 4

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)………………………………………………...……6

*Elizabeth Cady Stanton Tr. V. Neronha*,
    No. 22-cv-00245-MSM (D.R.I.)……………………………………...……5

*Edmonson v. Leesville*,
    500 U.S. 614 (1991)………………………………………………………..17

*ex. rel. Ashcroft v. Fulton*,
    642 S.W. 2d 617 (Mo. 1982)……………………………………….……5

*Frontiero v. Richardson*,
    411 U.S. 677 (1973)…………………………………….…………11, 12, 16

*Garcia-Catalan v. U.S.*,
    734 F.3d 100 (1st Cir. 2013)……………………………………….……….....1

*Goldberg v. Rostker*,
    509 F. Supp. 586 (E.D. Pa. 1980)………………………………………16, 17

*Hawke v. Smith*,
    253 U.S. 221 (1920)……………………………………………………….9

*Hollingsworth v. Virginia*,
    3 U.S. (3 Dall.) 378 (1798)…………………………………...………………9

*Idaho v. Freeman*,
    529 F. Supp. 1107 (D. Idaho 1982)……………………………………8, 20

*Illinois v. Ferriero*,
    60 F.4th 704 (D.C. Cir. 2023)…………………………………...……….5

*In re Booth,*
    3 Wis. 1 (1854)…………………………………………………….……..12

*Jacobsen v. Massachusetts,*
    197 U.S. 11 (1905)…………………………………………………...…….6

*Kerin v. Titeflex Corp.,*
    770 F.3d 978 (1st Cir 2014)…………………………………….…………1

*Kyle-Labell v. Selective Service,*
    364 F.Supp. 3d 394 (D.N.J. 2019)………………………………….……14, 15, 16

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)…………………………………………………………1

*N.O.W., Inc. v. Idaho,*
    459 U.S. 809 (1982)…………………………………...…………….8

*Idaho v. Freeman,*
    625 F.2d 886 (9th Cir. 1980)……………………………………….…….20

*Nat'l League of Cities v. Usery,*
    426 U.S. 833 (1976)……………………………………………...…….4

*Poy v. Boutselis,*
    352 F. 3d 479 (1st Cir. 2003)……………………………………...……..6

*Reddy v. Foster,*
        845 F.3d 493 (1st Cir. 2017)………………………………………………….15

*Reed v. Reed,*
        404 U.S. 71 (1971)…………………………………………………….. …13, 16

*Rostker v. Goldberg,*
        453 U.S. 57 (1981)……………………………………………….………14, 15

*Schwartz v. Brodksy,*
        265 F.Supp.2d 130 (D. Mass. 2003)………………………..………………16

*U.S. v. SCRAP,*
        412 U.S. 669 (1973)……………………………………………….……15

*Strahan v. Coxe,*
        127 F.3d 155 (1st Cir. 1997)……………………………………………..5

*Strauder v. West Virginia,*
        100 U.S. 303 (1880)……………………………………………….……17

*Students for Fair Admissions v. President and Fellows of Harvard College,*
        980 F.3d 157 (1ˢᵗ Cir. 2020)……………………………………....11, 12, 19

*Thurman v. City of Torrington,*
        595 F. Supp. 1521 (D. Conn. 1984)………………………………..……10

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.,*
        647 F.3d 377 (1st Cir. 2011)………………………………………...…………1

*U.S. v. DeRobertis,*
        538 F.Supp. 899 (N.D. Ill. 1982)……………………………….…………12

*U.S. v. Schwimmer,*
        279 U.S. 644 (1929)…………………………………………..…………17

*U.S. v. Skrmetti,*
        605 U.S. ___ (2025)…………………………………………………19

*U.S. v. Virginia,*
        518 U.S. 515 (1996)……………………………………………..……11, 12

*Valame v. Biden,*
        No. 5:2023cv03018 (N.D. Cal.)……………………………………….5, 19

*Valame v. Biden*,
  Docket No. 24-369 (9th Cir.)……………………………………....……19

*Virginia et al. v. Ferriero*,
  1:20-cv-00242 (D.C. Dist.)………………………………...…………….5

*Warth v. Seldin*,
  422 U.S. 490 (1975)……………………………………………………1

*Westminster School District v. Mendez*,
  161 F.2d 774 (9th Cir. 1947)………………………………………..12

*White v. Crook*,
  251 F.Supp. 410 (M.D. Ala. 1966)……………………………...……15, 17

*Whren v. U.S.*,
  517 U.S. 806 (1996)………………………………………………..10

**Constitutional Provisions**

Amend. V, United States Constitution ……………………………………...……1

Amend. X, United States Constitution………………………………...……………4

Amend. XIV, United States Constitution……………………….………...…………9

Amend. XV, United States Constitution……………………………...…………….9

Amend. XVIII, United States Constitution …………………………………...…….7

Amend. XIX, United States Constitution…………………………...…………….7, 9

Amend. XX, United States Constitution …………………………...…………….6

Amend. XXI, United States Constitution ……………………………….…..…….7

Amend. XXII, United States Constitution ……………………………………….7

Amend. XXIII, United States Constitution …………………….…………………7

Amend. XXIV, United States Constitution …………………...……………….…...7

Amend. XXV, United States Constitution …………………………………….…...7

Amend. XXVI, United States Constitution …………..………….…………………7

Amend. XXVII, United States Constitution……………………..…..……..….…4

Amend. XXVIII, United States Constitution……………………………..…..*passim*

Art. V, United States Constitution ………………………………………….... *passim*

**Statutes, Codes, and Resolutions**

50 U.S.C., § 3801 et seq, (Military Selective Service Act)……………….…………*passim*

92 Stat. 3795 (1978)……………………………………………………….………8

S. Con. Res. 120, 102nd Congress (1991–92)………………………...……………4

H. Con. Res. 120, 102nd Congress (1991–92)………………….…………………..4

H.J. Res. 25, January 31, 2023……………………………………………..……2

Illinois S.J. Res. Const. Amend. 0004, 100th Gen. Assemb………………………….8

Nevada S.J. Res. 2, 79th Leg……………………………………...….…………..8

**Rules**

F.R.C.P. 12(b)(1)……………………………………………………….………1

F.R.C.P. 12(b)(6)……………………………………………………………1

**Other Authorities**

10 Cong. Rec. 6628 (1955)………………………………………………………..7

75 Cong. Rec. 3856 (1932)…………………………………………………..……6

92 Stat. 3795 (1978)……………………………………………...………………7

*Archivist Letter to Congresswoman Maloney*, October 25, 2012, available at
https://www.scribd.com/ document/557659874/Ferriero-Letter-of-Oct-25-2012-
to-Rep-Maloney..........................................................................................................8

Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the
27th Amendment*, 61 FORDHAM L.REV. 497 (1992)………………………….……..10

Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays
From Discrimination*, CBSNews.com, January 4, 2011………………………………...13

Cong. Globe, 40th Cong., 2d Sess. 4266 (1868)…………………………………….………9

*Congresswoman Maloney Letter to the Archivist,* August, 23, 2012, available at, *https://www.scribd.com/document/557671897/Rep-Maloney-Ltr-to-Ferriero-Aug-2012*.......................................................................................................……………8

*Debates on Woman Suffrage Referendum*, Mass. Archives, Legis. Records, Series 1915-03……………………………………………………………...………17

Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386 (1983)……………………………………………….……6, 10

DeSimone, D., *Why 9/11 Inspired These Service Members to Join the Military*, USO.org, Sept. 7, 2021……………………………………………………….…………18

*Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978)...5, 10

THE FEDERALIST NO. 21…………………………………………………………..7

THE FEDERALIST NO. 39…………………………………………………………..7

THE FEDERALIST NO. 43…………………………………………………………..7

Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147 (1973)……………………………………………………………9

Gillibrand, K, press release, *ERA is the Law of the Land,* https://www.gillibrand. senate.gov/news/press/release/gillibrand-statement-on-president-biden-declaring-the-era-as-the-law-of-the-land/……………………………………………………………………2

Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009)…………..13

Heckman, J., *Governmentwide hiring plan calls on agencies to recruit 'patriotic Americans' into federal workforce*, Federal News Network, May 29, 2025……………18

Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017)…………………..……13

Jameson, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 4th ed., Riverside Press (1887)……………………………………………………..10

Joint Judiciary Committee Report on the Equal Rights Amendment, Report No. 92-359, 92d Congress, *Equal Rights For Men And Women*, July 14, 1971………………………11

Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*, 66 U. CHI. L. REV. 437 (1999)………………………………………..…..4, 6

Kinnard, M., *Biden Says the Equal Rights Amendment is the Law of the Land*, Associated Press, APNews.com, January 17, 2025………………………………………2

Krieger N., *Discrimination and Health Inequities*, 44 INT'L J. OF HEALTH SERV. 643 (2014)……………………………………………………………………..……13

*Letter from State Attorneys General to U.S. Congress* (February 22, 2020)………...……6

Lincoln, A., *Gettysburg Address,* 1863……………………………………………..……18

Natelson, R., *Amending the Constitution by Convention: A More Complete View of the Founders' Plan*, Independence Institute (2010)………………………………..……9

National Archives, Milestone Documents, *14th Amendment to the U.S. Constitution: Civil Rights* (1868), https://www.archives.gov/milestone-documents/14th-amendment....9

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf............................................................................8

National Public Radio, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR.org. (Dec. 3, 2015)……………………………….………14

Neale, T.,  CONG. RESEARCH SERV. R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018)…………………11

New York City Bar Association, *Statement Calling for the Publication and Certification of the Equal Rights Amendment*, December 24, 2024, https://www.nycbar.org/reports/publication-and-certification-of-the-equal-rights-amendment-biden/#_edn15…………...3

*Opinions of the Office of Legal Counsel of the Dep't of Justice*, Congressional Pay Amendment, 16 Op. O.L.C. 85 (May 13, 1992)………………………..……………..……4

Rankin, S., *With Virginia's Ratification, ERA Fight Advances*, ASSOCIATED PRESS, (Jan. 27, 2020)…………………………………………………………….………2

*Ratification of the Equal Rights Amendment, Memorandum for the General Counsel National Archives and Records Administration*, slip op., Jan. 6, 2020…………4

Selective Service, *Register*, https://www.sss. gov/register/………………….……..17

SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993), https://www.ojp.gov/pdffiles1/Digitization/ 145360NCJRS.pdf ……………………………………………….……………..14

*Suffolk University/USA Today Issues Poll*, October 2018, https://www.suffolk.edu/- /media/suffolk/documents/academics/research-at-suffolk/suprc/polls/national/2018/ %2010_25_2018_marginals_pdftxt.pdf?la=en&hash=7303DAC9B701D7E65632FEDDF 60B260C8%20983B994 …………………………………………….…………………..3

Temple, S., ERA is the Law, Says ABA, *Democrats Abroad*, August 8, 2024, https://www.democratsabroad.org/sharitemple/era_is_the_law_says_aba………… 2

Tribe, L., Sullivan, K., *ERA is the Law of the Land*, The Contrarian, January 17, 2025, https://contrarian.substack.com/p/the-equal-rights-amendment-at-long...........................2

U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1, July 6, 2006………………………..13

U.N. Women*, Investing in Gender Equality and Women's Empowerment* Oct. 31, 2010………………………………………………………………………….13

*Violence Against Women Act*, H.R. conf. rep. no. 103–711 (1994)……………………..14

Wright, D., "*An Atrocious Way to Run A Constitution": The Destabilizing Effects of Constitutional Amendment Rescissions*, 59 DUQUESNE L. REV. 12 (2021)…………….....10

## INTRODUCTION

This is a constitutional challenge to the Military Selective Service Act (MSSA), 50

U.S.C., § 3801 et seq., which requires "male citizens" aged 18 through 25 to register for the draft

but forbids females to do the same. Plaintiffs assert claims under the Equal Rights Amendment

(ERA) and the 5th Amendment. Defendants have filed a motion to dismiss under Rules 12(b)(1)

and 12(b)(6). It should be denied.

## LEGAL STANDARDS

Under Rule 12(b)(1), the court must "accept as true all well-pleaded fact[s] . . . and indulge

all reasonable inferences in the plaintiff[s'] favor." *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st

Cir. 2014). General allegations of injury suffice as it is presumed that they embrace "specific facts

… necessary to support the claim." *Warth v. Seldin,* 422 U.S. 490, 508 (1975). At the motion to

dismiss stage, plaintiffs need not set forth evidence that would be required at the summary

judgment stage. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Under Rule 12(b)(6) allegations need only be plausible to support a reasonable inference

that the defendant is liable. *Garcia-Catalan v. U.S.*, 734 F.3d 100, 103 (1st Cir. 2013). The court

must "accept as true all well-pleaded facts," analyze them in a light most hospitable to the plaintiff

and draw all reasonable inferences for the plaintiff." *U.S. ex rel. Hutcheson v. Blackstone Med.,*

*Inc.*, 647 F.3d 377, 383 (1st Cir. 2011). There need only be "more than a sheer possibility that a

defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## FACTS

On March 25, 2025, Plaintiff Jacqueline Fenore, a female between the ages of 18 and 25,

attempted to register for Selective Service through its online portal. Her registration was rejected

solely because she is female. Later that same month, two members of Plaintiff Equal Means Equal

(EME), females between the ages 18 and 25, also attempted to register for Selective Service. Their registrations were rejected solely because they are female. Com.pp.3-4.

## ARGUMENT

I.    **THE ERA IS THE TWENTY-EIGHTH AMENDMENT**

When an amendment is proposed by two-thirds of Congress and "ratified by the legislatures of three fourths of the several states," it "shall be valid to all intents and purposes, as part of this Constitution…." U.S. CONST. art. V; *Dillon v. Gloss*, 256 U.S. 368, 376 (1921). The ERA was proposed in 1972 and ratified by the last necessary state on January 27, 2020. Rankin, S., *With Virginia's Ratification, ERA Fight Advances*, ASSOCIATED PRESS (Jan. 27, 2020). Therefore, the ERA is now the Twenty-Eighth Amendment to the U.S. Constitution.

Many scholars, the American Bar Association, government officials, and even President Biden agree that because the conditions of Article V have been satisfied, the ERA is valid. See e.g., H.J. Res. 25, January 31, 2023 (dozens of congresspeople submit "Joint Resolution" declaring the ERA valid); Kinnard, M., *Biden Says the Equal Rights Amendment is the Law of the Land*, Associated Press, APNews.com, January 17, 2025; Temple, S., *ERA is the Law*, *Says ABA*, Democrats Abroad, August 8, 2024. Senator Kirsten Gillibrand agrees, Gillibrand, K., Press Release, *Statement on President Biden Declaring the ERA the Law of the Land*, January 17, 2025, as do constitutional law professors Lawrence Tribe and Kathleen Sullivan, *The Equal Rights Amendment At Long Last*, The Contrarian, January 17, 2025.[1]

---

[1] Defendants argue that these government officials are merely expressing beliefs, and that beliefs cannot override binding Supreme Court precedent D.Mem.17-18, citing *Dillon v. Gloss*, 256 U.S. 368, 376 (1921) and *Coleman v. Miller*, 307 U.S. 433, 452 (1939). Fair enough, but as discussed at length herein, *Dillon* and *Coleman* are not binding precedent. *See* Arguments 1a and 1b. Moreover, statements of government officials and scholars should not be denigrated as mere beliefs since they participate directly in the development of laws and judges routinely rely on them to determine doctrinal contours. In a healthy democracy, such opinions should bear on how

a.    The Deadline is Per Se Invalid

Defendants correctly note that Congress burdened the States with a ratification deadline of seven years (later extended to ten), and that the ERA was ratified long after it expired, but the ERA is valid nonetheless because Article V nowhere authorizes Congress to impose deadlines.

In *Dillon v. Gloss*, 256 U.S. 368, 376 (1921) the Supreme Court said that Article V implies congressional authority to impose deadlines, but this should be disregarded as dictum because it was not necessary to the Court's adjudication of the issues.[2] Moreover, *Dillon* is not good law as it is premised on the notion that States must ratify amendments contemporaneously with congressional proposal to ensure national consensus.[3] *Id.* at 375. This arcane view has not

---

courts view the strength of legal arguments. For a list of influential groups that agree the ERA is now valid, see New York City Bar Association, *Statement Calling for the Publication and Certification of the Equal Rights Amendment*, December 24, 2024, notes 1, 3, 5.

[2] Language in *Dillon* allowing deadlines was described as a "holding" in *Coleman, id.*, at 452, but dictum cannot be converted to a holding by declaration, and the "holding" language in *Coleman* was itself dictum because the issue of deadlines was not before the Court. *Coleman* involved whether the Kansas legislature could ratify an amendment with no deadline after first voting against it, and whether it could do so thirteen years after congressional proposal. Those questions have nothing to do with whether Congress may set deadlines. On the timeliness of ratifications, *Coleman* said (in a plurality ruling from a highly divided court) only that Congress has authority to determine the reasonableness of the passage of time between proposal and ratification *if an amendment has no deadline*. *Id.* at 452-54. That is obviously not the case here because the ERA has a deadline, albeit an invalid one. Defendants also argue that *Coleman* stands for the proposition that this case raises nonjusticiable political questions. Again, *Coleman* is inapt as it did not involve any of the Article V questions presented here. Indeed, as Defendants concede in Section II of their memorandum, several courts have adjudicated the Article V issues raised in this case, including the validity of the ERA and its deadline, D.Mem.16-17, and whether the States may rescind. D.Mem.5. None of these courts ruled that the issues were nonjusticiable political questions.

[3] Contemporaneity does not ensure national consensus. The 18th Amendment was ratified quickly but did not reflect consensus as it was repealed a few years later. And although it took 48 years to ratify the ERA, an arguably non-contemporaneous amount of time, national polling in 2018 demonstrated clear consensus in support of the ERA. *Suffolk University/USA Today Issues Poll*, October 2018 (75% were more likely to vote for a candidate that supports the ERA).

withstood the test of time, which was made obvious in 1992 when the Archivist published the 27th Amendment,[4] and Congress voted to validate it,[5] S. Con. Res. 120–102nd Congress (1991–92); H. Con. Res. 120–102nd Congress (1991–92), some *203 years* after its proposal. Government officials accepted the 27th Amendment as valid despite the lack of contemporaneity *and* a Supreme Court ruling decades earlier that said it was already too old, in 1921, to ratify. *Id.*, at 375. Either *Dillon* is no longer good law, or the 27th Amendment is not part of the Constitution.[6]

More importantly, the ERA's deadline is invalid because it disrupts the balance of power between Congress and the States. The framers wrote Article V the way they did because they were concerned that Congress would enact laws contrary to Article V and take power away from the States - hence, the people - and shift it to Congress. This "was of utmost concern to the framers." Kalfus, M., *Why Time Limits on the Ratification of Constitutional Amendments Violate Article V*, 66 U. Chi. L. Rev. 437, 452–53 (1999). Indeed, the 10th Amendment was adopted to protect the States from having their powers diminished by Congress. *Nat'l League of Cities v. Usery*, 426 U.S. 833, 843 (1976) (10th Amendment "declares the constitutional policy that the Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively,

---

[4] Notably, the Archivist readily published the 27th Amendment on May 7, 1992, after the last state ratified it, *before* the Office of Legal Counsel ("OLC") advised him that, "the effective date of the amendment is the date on which it was ratified by the 38th State." *Opinions of the Office of Legal Counsel of the Dep't of Justice*, Congressional Pay Amendment, 16 Op. O.L.C. 85 (May 13, 1992). This stands in stark contrast to the OLC's letter *forbidding* publication of the ERA *despite* it being ratified by 38 states. *Ratification of the Equal Rights Amendment, Memorandum for the General Counsel National Archives and Records Administration*, slip op., Jan. 6, 2020.

[5] Congress has no authority to disregard Supreme Court precedent but that is what it did when it declared the 27th Amendment valid in 1992 despite *Dillon's* admonition in 1921 that it was already too old to ratify.

[6] That the 27th Amendment was validated despite the passage of 203 years is reason enough to invalidate the ERA's deadline because it is an official declaration that deadlines do not matter.

in a federal system"); *See Strahan v. Coxe*, 127 F.3d 155, 167 (1st Cir. 1997) ("… while Congress may regulate the conduct of individuals, it may not generally regulate the conduct of the States.")

Only one federal appellate court has addressed the deadline's validity, but it resolved the case on procedural grounds, saying only in dictum that the deadline is valid because of *Dillon*. *Illinois v. Ferriero*, 60 F.4th 704, 716-719 (D.C. Cir. 2023).[7] As dictum, *Ferriero* is not binding on this Court, nor is it persuasive authority because its dictum relies on *Dillon's* dictum.

### b. The Deadline is Invalid Because it is in the Preamble

Even if Congress may impose deadlines, the ERA's deadline is invalid because Congress placed it in the preamble rather than the text.[8] Article V authorizes Congress to do only two things, propose amendments and determine the mode of ratification, U.S. CONST. ART. V. Any authority to place deadlines in preambles must come from one of these provisions.

It cannot come from Congress' proposal power because the States only have authority to ratify "proposed" amendments and preambles are not part of amendments. *See, ex. rel. Ashcroft v. Fulton*, 642 S.W. 2d 617, 619-20 (Mo. 1982) (language in a preambulatory resolution proposing an amendment to the Missouri Constitution must be disregarded because it is not part of the amendment); *see also, Equal Rights Amendment Extension, Hearings on H.J. Res. 134 Before the*

---

[7] The District Court in *Ferriero* also ruled that the deadline was valid, but again, it was only dictum because the case was dismissed for lack of standing. *Virginia et al. v. Ferriero*, (same case) 1:20-cv-00242 (D.C. Dist.), Doc.117, March 5, 2021. Another District Court ruled that the ERA is not valid, primarily because the Archivist did not publish it, *Valame v. Biden*, No. 5:2023cv03018 (N.D. Cal.), thus "precluding its creation." Doc.61, pp.4-6. In support of this ruling, the *Valame* court cited *Elizabeth Cady Stanton Tr. V. Neronha*, No. 22-cv-00245-MSM (D.R.I.), another District Court that similarly found the ERA to be invalid because it has not yet been published in the Constitution. *Valame* at pp.4-5. Both courts misunderstand that publication is a ministerial act that has no bearing on an amendment's validity. *Dillon,* at 376.

[8] *Dillon* offers no guidance on this issue as the deadline there was in the text of the amendment.

*Subcomm. On Civ. and Const. Rights of the H. Comm. On the Judiciary*, 95th Cong. 57 (1978) (states "ratify[ ] the text of the Amendment and not the preliminary language of the resolution"). Congress itself raised concerns about adding substantive content to preambles when it was suggested that a deadline be added to the preamble of the 20th Amendment, with members saying it would be "of no avail" as it would not be "part of the proposed constitutional amendment." 75 Cong. Rec. 3856 (1932). Congress thus placed deadlines in the text of the next three amendments.

Nor can such power be derived from Congress' authority to determine the mode of ratification because selecting the mode entails choosing whether the States ratify by convention or legislative act and placing a deadline in a preamble has nothing to do with either. Indeed, Congress determining the mode is a *procedural* act that *facilitates* the States' Article V powers, while imposing a deadline ion the States is a substantive act that restricts them. *Poy v. Boutselis*, 352 F. 3d 479 (1st Cir. 2003) (limitation period is substantive when integral to the right in controversy). *See* Kalfus, *Time Limits*, *supra*, at 464; Dellinger, W., *The Legitimacy of Constitutional Change: Rethinking the Amendment Process*, 97 HARV. L. REV. 386, 408–09 (1983). In similar circumstances, courts have not enforced preambles because they "ha[ve] never been regarded as the source of any substantive power conferred. . .." *Jacobsen v. Massachusetts*, 197 U.S. 11, 22 (1905). *See District of Columbia v. Heller*, 554 U.S. 570, 578 (2008) (prefatory clause cannot limit or expand the scope of the operative clause").[9]

---

[9] In 2020, attorneys general from nearly half the States agreed that the language in the ERA's preamble is not binding on the States. *Letter from State Attorneys General to U.S. Congress* (February 22, 2020) ("[R]ather than including … [a deadline] in the ERA's text, Congress relegated a seven-year deadline to the joint resolution that proposed the ERA . . . No court has found that such an external limit is at all binding" on the States).

If this Court rules that Congress may impose extra-textual deadlines on the States, it will be condoning the idea that Congress has unilateral authority to amend the Constitution because it can impose short deadlines on amendments preferred by the States, to defeat them, and long deadlines or none at all on amendments they prefer, without ever affording the States an opportunity to approve or reject them.[10] This cannot be tolerated as the framers were clear that the States' amendatory powers should be *equal* to those of Congress. THE FEDERALIST NO. 43 (Alexander Hamilton) ("Article V equally enables the general and the States governments"); THE FEDERALIST NO. 39 (James Madison) (the balance struck in Article V makes the amendment process "neither wholly national nor wholly federal"); THE FEDERALIST NO. 21 (Alexander Hamilton) (strong national government could harm the autonomy of the States).

This Court should not imbue Congress with such authority because Congress' handling of deadlines has been arbitrary. No deadlines were in any amendments for the first 130 years. They appeared relatively recently with the 18th in 1917, and only a handful of times since, without consistency. The 19th did not have one at all, and when they were imposed, some were placed in the text (18th, 20th, 21st, 22nd) while others were placed in the preamble. (23rd, 24th, 25th, 26th). Not until 1960 did Congress place a deadline in a preamble, claiming this would "declutter" the text, 10 Cong. Rec. 6628 (1955).[11] Then in 1978, Congress placed a deadline in the text *and* the preamble of a proposed amendment. 92 Stat. 3795 (1978).

---

[10] Short deadlines can also cause states *to* ratify, as happened with the 18th Amendment. The point is not whether short or long deadlines cause certain results; it is that deadlines allow Congress to put pressure on the States in a way that undermines their constitutional powers under Article V.

[11] If placing a deadline in a preamble were truly about decluttering, why would Congress "clutter" the ERA's text with language about delaying the effective date of the ERA for two years after ratification? Delaying the enforcement date does not restrict States' Article V rights, yet the States were able to vote on it because it was in the text. Imposing a deadline on ratification *does* restrict the States' Article V rights, yet they were unable to vote on it because it was in the preamble.

Importantly, the Archivist issued a letter in 2012 stating that he was duty bound to record ERA ratifications and would publish the ERA as soon as 38 states ratified it, regardless of the deadline.[12] People then advocated for more ERA ratifications, and states voted to ratify, because they believed the deadline posed no barrier. Nevada ratified in 2017 (S.J. Res. 2, 79th Leg.), Illinois in 2018 (S.J. Res. Const. Amend. 0004, 100th Gen. Assemb.), and Virginia in 2020.[13]

If Congress may place deadlines in preambles, can they also say in a preamble, "two-thirds of the States must approve this preamble"? The obvious answer is no because this would subvert Article V. The same is true for deadlines. If Congress wants the power to use preambles to restrict States' Article V rights, it must first give itself the authority to do so by changing Article V.

II.    **STATES CANNOT RESCIND RATIFICATIONS**

Several states purport to have rescinded their ERA ratifications, but those actions are legal nullities[14] because Article V does not permit rescissions and the Supreme Court has never recognized a purported rescission as valid.[15]

---

[12] The Archivist's letter was in response to a question from Congresswoman Carolyn Maloney about the legal status of the ERA. *Congresswoman Maloney Letter to the Archivist*, August 23, 2012. The Archivist replied, "Once NARA receives at least 38 state ratifications of a proposed constitutional amendment, NARA publishes the Amendment along with a certification of the ratifications and it becomes part of the Constitution." *Archivist Letter to Congresswoman Maloney*, October 25, 2012.

[13] The Archivist recorded these votes but later added, "ratification actions occurred after Congress's deadline expired." NATIONAL ARCHIVES AND RECORDS ADMINISTRATION: EQUAL RIGHTS AMENDMENT, LIST OF STATE RATIFICATION ACTIONS, (https://www.archives.gov/files/foia/pdf/era-list-of-state-ratification-actions-03-24-2020.pdf).

[14] In his 2012 letter explaining the legal status of the ERA, the Archivist said, "a later recission of a state's ratification is not accepted as valid." See, n.12.

[15] Rescissions were recognized as valid in *Idaho v. Freeman*, 529 F. Supp. 1107, 1150 (D. Idaho 1982), a case that was appealed to the Supreme Court but later vacated as moot. *N.O.W., Inc. v. Idaho*, 459 U.S. 809 (1982).

Other amendments have been validated despite purported rescissions. The 14th was adopted when three-fourths (28) of the States ratified it, even though New Jersey and Ohio had voted to rescind. 15 Stat. 706 (1868).[16] Cong. Globe, 40th Cong., 2d Sess. 4266, 4295-96 (1868); *see Coleman*, 307 U.S. at 448–49. Rescissions of the 15th and 19th were also not accepted as valid. Fishell, L.A., *Note, Reversals in the Federal Constitutional Amendment Process: Efficacy of State Ratifications of the Equal Rights Amendment*, 49 IND. L.J. 147, 150 (1973).

That Article V permits Congress to direct the States to ratify by convention rather than by legislative act proves that rescissions are not possible. The convention process is a unique, ad hoc event during which the States ratify through specially elected delegates who need not be members of the legislature. Their sole purpose is to decide whether to ratify an amendment. When the convention is done, it is adjourned. This process was included in Article V to allow for greater direct public participation, and to avoid the problem of entrenched political interests in state legislatures. Natelson, R., *Amending the Constitution by Convention: A More Complete View of the Founders' Plan*, Independence Institute, (2010) at 6. Because conventions expire, rescissions are not possible, thus, all rescissions are invalid because the framers would not have permitted two modes of ratification but allowed for rescissions under only one.

Rescissions are also invalid because amending the Constitution is not ordinary lawmaking, subject to shifting political winds. *Hollingsworth v. Virginia,* 3 U.S. (3 Dall.) 378, 381 (1798) (amendment process is "unconnected with the ordinary business of legislation"); *Hawke v. Smith*,

---

[16] The 14th Amendment was adopted on July 9, 1868, when the 28th state ratified it. National Archives, Milestone Documents, *14th Amendment to the U.S. Constitution: Civil Rights* (1868). The 28 States included New Jersey and Ohio, but they rescinded on March 24, 1868, and January 15, 1868, respectively. Either rescissions are not permitted, or the 14th Amendment was not ratified on July 9, 1868.

253 U.S. 221, 229 (1920) (ratification is not an act of legislation). Amending the Constitution is a solemn process, which is why scholars emphasize that ratification is one-way ratchet as this prevents chaos, preserves the integrity of Article V, and respects the balance of State and National powers. See Jameson, J., A TREATISE ON CONSTITUTIONAL CONVENTIONS, 629-33 (4th ed., Riverside Press 1887); Bernstein, R.B., *The Sleeper Wakes: The History and Legacy of the 27th Amendment*, 61 FORDHAM L.REV. 497, 548 (1992); Dellinger, *Constitutional Change*, *supra*, at 421-27 ("… once an amendment is ratified, the state is committed. Otherwise, think of the constitutional chaos …"); *Equal Rights Amendment Extension Hearings, supra*, (testimony of Prof. William Van Alstyne, noting that rescissions would be "profoundly ill-advised constitutional policy … No state ought to consider an amendment to the Constitution under the misimpression … that it may do it with some sort of celerity or spontaneity … That … is an atrocious way to run a Constitution. The policy that … [ratification] … when done … is done irrevocably, is terribly important … to the integrity of the role of Congress and the States.") *See* Wright, D., "*An Atrocious Way to Run A Constitution": The Destabilizing Effects of Constitutional Amendment Rescissions*, 59 DUQUESNE L. REV. 12, 17 (2021).[17]

### III.    BECAUSE THE ERA IS VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW

Equal "protection" of the laws means ensuring that laws, policies, and programs of the government *are enforced equally*,[18] and *applied equally*,[19] on behalf of women. The ERA does this

---

[17] If the States may rescind ratifications, may Congress rescind proposals?

[18] *See Thurman v. City of Torrington*, 595 F. Supp. 1521, 1527 (D. Conn. 1984) ("affording [women] inadequate [police] protection . . . is subject to the Equal Protection Clause.")

[19] *Whren v. U.S.*, 517 U.S. 806, 813 (1996) (". . .constitutional basis for objecting to discriminatory application of laws is the Equal Protection Clause").

by requiring that courts apply a "strict scrutiny" standard of judicial review. *Frontiero v. Richardson*, 411 U.S. 677, 691-92 (1973) (Powell, J., concurring) (when the ERA is adopted, it will require courts to apply "the strictest test of judicial scrutiny");[20] Joint Judiciary Committee Report on the Equal Rights Amendment, Report No. 92-359, 92d Congress, *Equal Rights For Men And Women*, July 14, 1971, p.4 ( "[u]nder the text of the [ERA] . . . [j]ust as statutes classifying by race are subject to a very strict standard of equal protection scrutiny under the 14th Amendment, so too … classifying by sex would likewise be subject to a strict standard of scrutiny . . .").

Strict scrutiny is the only standard that affords women full equality because it requires classifications based on sex to serve a "compelling" government interest, be "narrowly tailored" to serve that interest, and use the "least restrictive means" to achieve the government's goal. *Students for Fair Admissions v. Harvard,* 600 U.S. 181, 206, 213-230 (2023) (strict scrutiny requires a compelling government interest, narrow tailoring, and proof that there are no "workable race-neutral alternatives…")  Without the ERA women enjoy only intermediate scrutiny[21] which requires only an "important" interest and a "substantial relationship" between that interest and the government's goal. *U.S. v. Virginia*, 518 U.S. 515, 531-34 (1996). It utilizes no narrow tailoring or "least restrictive means" tests. These are crucial aspects of strict scrutiny because they prevent unnecessary discrimination. Under intermediate scrutiny, unnecessary discrimination is permitted.

---

[20] ERA ratification votes slowed after *Frontiero*. perhaps because the Court gave women strict scrutiny (albeit in a plurality), which is what the ERA would give women. This relieved the states of political pressure to ratify. Neale, T.,  CONG. RESEARCH SERV., R42979, THE PROPOSED EQUAL RIGHTS AMENDMENT: CONTEMPORARY RATIFICATION ISSUES, 14 (2018).

[21] Some courts refer to intermediate scrutiny as "heightened scrutiny," but this is a misnomer as it is a lesser standard than strict scrutiny, hence should be described as "lowered scrutiny."

IV.   **EVEN IF THE ERA IS NOT VALID, PLAINTIFFS ARE ENTITLED TO STRICT SCRUTINY REVIEW UNDER THE FIFTH AMENDMENT**

Even if the ERA is not valid, this Court should apply strict scrutiny under the 5th Amendment because intermediate scrutiny discriminates against women by treating them unequally. This cannot stand under any legitimate interpretation of a constitutional doctrine that guarantees people *Equal* Protection of the laws. *Students for Fair Admissions, Inc.*, *supra*, at 206 (the guarantee of Equal Protection "'cannot mean one thing when applied to one individual and something else when applied to [another].'" (citation omitted).[22]

In *Frontiero v. Richardson*, 411 U.S. 677 (1973) a plurality of the Supreme Court rightly adopted strict scrutiny for women under the 14th Amendment's Equal Protection Clause based on the nature of femaleness as a suspect class, women's long suffering based on their femaleness, and women's alignment with race as a category worth of strict scrutiny because sex, like race, is determined at birth and immutable. *Frontiero* at 691-92.[23]

---

[22] While the current judicial review standard for women under *U.S. v. Virginia*, 518 U.S. 515, 531-34 (1996) is intermediate scrutiny, it would not be unprecedented for this court to resist applying it on the grounds that it conflicts with women's fundamental rights. *See e.g., U.S. v. DeRobertis*, 538 F.Supp. 899, 909, n. 11  (N.D. Ill. 1982) (resisting Supreme Court precedent not requiring trial court interrogation of a defendant prior to jury waiver); *Westminster School District v. Mendez*, 161 F.2d 774, 779-80 (9th Cir. 1947) (en banc) (resisting precedent permitting racially segregated schools); *In re Booth,* 3 Wis. 1 (1854) (resisting precedent permitting slavery, which was then overturned by the Supreme Court in *Ableman v. Booth*, 62 U.S. 514 (1859), but the Wisconsin Supreme Court refused to honor the Supreme Court's writ, *Ableman v. Booth*, 11 Wis. 501 (1859)). Of course, this Court could avoid resisting precedent simply by validating the ERA because it requires strict scrutiny. *Frontiero v. Richardson*, 411 U.S. 677, 691-92 (1973).

[23] Soon after *Frontiero*, strict scrutiny was replaced with intermediate scrutiny. *Craig v. Boren*, 429 U.S. 190, 217 (1976) (Rehnquist, J. dissenting) ("only redeeming feature of the Court's opinion … is that it [ ] signals a retreat by those who joined the plurality opinion in *Frontiero* … from their view that sex is a 'suspect' classification for purposes of equal protection analysis").

Women have waited long enough for full equality, and they have suffered enough throughout this country's long and shameful history of subjugating women in the Constitution, first as non-persons with no Equal Protection rights at all when the 14th Amendment was adopted in 1868, and then when women were finally recognized as persons with *some* Equal Protection rights in *Reed v. Reed*, establishing those rights as unequal by giving women only rational basis review. 404 U.S. 71, 76-77 (1971). Rational basis was later elevated to intermediate scrutiny in *Craig v. Boren*, 429 U.S. 190, 217 (1976), but women remain unequal today because intermediate scrutiny is less protective than strict scrutiny.[24]

Unequal protection is state-sanctioned discrimination that causes women to suffer disproportionately high rates of violence,[25] and injures women in their dignity, autonomy, and humanity.[26] Discrimination also causes negative health consequences.[27] Researchers even found a correlation between higher rates of violence against persons who, because of state-sanctioned discrimination, are excluded from protection under hate crime laws.[28]

---

[24] As Justice Antonin Scalia candidly put it, the Constitution does not *require* discrimination against women, but neither does it prohibit it. Condon, S., Scalia: *Constitution Doesn't Protect Women or Gays From Discrimination*, CBSNews.com, January 4, 2011.

[25] U.N. General Assembly, *In-Depth Study on All Forms of Violence against Women: Report of the Secretary General,* A/61/122/Add.1 (6 July 2006) (inequality is the root cause of violence against women); U.N. Women*, Investing in Gender Equality and Women's Empowerment* (Oct. 31, 2010).

[26] Ho, J., *Finding Out What it Means to Me: The Politics of Respect and Dignity in Sexual Orientation Antidiscrimination*, 2017 UTAH L. REV. 463 (2017) (discussing philosophical and legal foundations of dignity, autonomy, and humanity in American law).

[27] Krieger N., *Discrimination and Health Inequities*, 44 INT'L J. OF HEALTH SERV. 643, 655, 687-88 (2014), (meta-analysis showing discrimination's negative health consequences).

[28] Hatzenbuehler, M. L., et al., *State-Level Polices and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations*. 99 AM. J. PUBLIC HEALTH (12) 2275 (2009) (higher rates of psychiatric disorders among persons in states that did not extend protections against hate crimes and discrimination to them, compared to states that did).

Women are further harmed by inequality when they seek redress in the courts. *Brzonkala v. Virginia Polytechnic Institute and State University*, 132 F.3d 949, 971 (4th Cir. 1997) ("… gender bias permeates the court system and … women are most often its victims"). Congress enacted the Violence Against Women Act to confront this "bias and discrimination" against women. H.R. conf. rep. no. 103–711, at 385 (1994); *see generally,* SENATE JUDICIARY COMMITTEE, *The Response to Rape: Detours on the Road to Equal Justice* (May 1993).

Strict scrutiny will close the inequality gap and help prevent these intolerable harms.

## V.    THE MSSA IS UNCONSTITUTIONAL UNDER STRICT SCRUTINY

Under strict scrutiny the MSSA is unconstitutional unless Defendants can show that excluding women is justified by a compelling government interest, is narrowly tailored to serve that interest, and uses the least restrictive means to achieve the government's goal. Defendants cannot meet this burden because there is no compelling reason to exclude women from registering for Selective Service. Indeed, Defendants make no such claim. Hence, there is no need to analyze whether the government can also prove narrow tailoring and least restrictive means, because without a compelling interest these questions are irrelevant.

Defendants rely on *Rostker v. Goldberg*, 453 U.S. 57 (1981) to defend the constitutionality of the MSSA. In *Rostker*, the Supreme Court upheld the exclusion of women under intermediate scrutiny because, at the time, women were ineligible to serve in combat, thus were less ready for military service should a draft be called. *Id*. at 64-72. This is no longer true because women have been eligible to serve in combat since 2015. National Public Radio, *Pentagon Says Women Can Now Serve in Front-Line Ground Combat Positions*, NPR.org, (Dec. 3, 2015). Because the salient facts underlying *Rostker* have changed, it is not controlling. *Kyle-Labell v. Selective Service*, 364 F.Supp. 3d 394, 405-08 (D.N.J. 2019) (declining to follow *Rostker* because women can now fight

in combat, reasoning that, "When the facts of a Supreme Court decision 'do not line up closely' … it cannot be said that the decision 'directly controls' the new case", *quoting, Jefferson City v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000)).[29]

## VI.    PLAINTIFFS HAVE STANDING

Standing is established when a plaintiff shows (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *Lujan*, 504 U.S. at 560–61. Injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). "[A]n identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *U.S. v. SCRAP*, 412 U.S. 669, 689, n.14 (1973). The injury need only be "a perceptible harm that distinguishe[s the plaintiff] from other citizens …" *Id.* at 689. Specific facts proving injury are not required at the pleading stage. *Lujan*, *supra*, at 561. Defendants argue that Plaintiffs suffered no injury and have not demonstrated organizational or associational standing. D.Mem.9-15. Their arguments fail.

### a.    Discriminatory Exclusion

When Ms. Fenore attempted to register for Selective Service, her application was rejected solely because of her sex. This injury, alone, established standing for a woman who filed the exact same case in New Jersey federal court. *Kyle-Labell, supra,* at 417 (female plaintiff had standing to mount an Equal Protection challenge to the MSSA solely because her Selective Service application was rejected based on her sex.)

---

[29] *Rostker* should also be distinguished because it applied intermediate scrutiny and Plaintiffs do not argue intermediate scrutiny or assent to the court applying it.

Discriminatory exclusion is a well-recognized injury. *White v. Crook*, 251 F.Supp. 401, 408-09 (M.D. Ala. 1966) (women had standing based solely on their exclusion from jury duty); *see*, *Carter v. Jury Commissioner*, 396 U.S. 320, 330 (1970) (Black people had standing based solely on their exclusion from jury service).

Defendants wrongly rely on *Schwartz v. Brodksy*, 265 F.Supp.2d 130 (D. Mass. 2003). In *Schwartz* a female and four males challenged the constitutionality of the MSSA, and the female was denied standing because she did not experience injury from exclusion, much less injury based on her sex. She never tried to register, and was not even age-eligible because she sued when was only 17, and the case was resolved before she turned 18. *Id*. at 131 & n.1.

The court's denial of standing to the female in *Schwartz* relied on language in *Goldberg v. Rostker*, 509 F.Supp. 586 (E.D. Pa. 1980) where standing was denied to persons who "… are not under any compulsion to register." *Id*., at 591. "Persons" obviously refers to males who could not register because there were no female plaintiffs. *Goldberg* was a class action filed by men for men. The class was defined as "all male persons who are registered or subject to registration." *Goldberg*, at 588-89 (citation omitted). The plaintiffs never asked to include women, but even if they had, women would have needed separate grounds for standing because the injury to males was defined as the act of registering, *id*. at 590-91, and females cannot suffer this injury. A female could have established injury in *Goldberg* by trying to register and being rejected, but that did not happen. As women did not seek standing in *Goldberg*, women were not denied standing in *Goldberg*. In turn, *Schwartz's* reliance on *Goldberg*, hence Defendants' reliance on *Schwartz,* are misplaced.

### b. Stigma and Stereotype

Laws establishing people as inferior create injury by stigmatizing and stereotyping them. *Reed v. Reed*, *supra*, (Idaho law preferring men over women as estate administrators causes

stigmatic injury by declaring women less competent); *Frontiero*, *supra*, (employee benefits policy favoring women stigmatizes women by stereotyping them as incapable of being primary breadwinners);[30] *Strauder v. West Virginia,* 100 U.S. 303, 308 (1880) (excluding people from civic service based on race is a stigmatizing "brand upon" Black people, "fixed by law," that stereotypes them as unfit to serve.) Ms. Fenore clearly suffered these injuries because the MSSA is "replete … with … sex stereotypes…" that "stigmatize[] women" and impose on them "… a badge of inferiority…" *Goldberg,* 509 F.Supp. at 586, 594, 597, n.15.

### c.    Denial of Equal Opportunity to Participate in Civic Life

Ms. Fenore also suffered injury because the government has forbidden her to participate equally in civic life.[31] This has been recognized as injury in many cases, including *Carter* and

---

[30] Women have been stigmatized for a very long time *because* they do not serve their country equally. In 1915, Massachusetts State Senator Charles Browne said, "voting is a privilege earned through civic sacrifice, such as military service, which women do not undertake." *Debates on Woman Suffrage Referendum*, Mass. Archives, Legis. Records, Series 1915-03. More recently, social media is filled with criticisms of women because they do not serve their country equally. On July 4, 2025, a post on X said, "Frankly women don't even deserve the vote because they don't … perform military service like every male in this country. Why is it that in 2025, women don't have to sign up for the draft, but men do … and then women get to vote and decide the fate of those men? Crazy." A Reddit post in 2023 said, "I'm all for equality … but the one thing I've noticed from especially feminist types is that when the topic of being drafted into the military comes up, the drive for equality tends to disappear real quick."

[31] It matters not that the MSSA imposes a duty; the injury is inherent in the discriminatory classification. See *Carter v. Jury Commissioner*, 396 U.S. 320, 330 (1970) (whether jury service is deemed a "right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise"). In any event, Selective Service is both a duty and a privilege. *Arver v. U.S.*, 245 U.S. 366, 390 (1918) (Selective Service involves a citizen's performance of a "supreme and noble duty of contributing to the defense of the rights and honor of the nation …"); *U.S. v. Schwimmer,* 279 U.S. 644, 650 (1929) ("the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need …", *citing Arver*, *supra*, at 378). Indeed, the MSSA website states that "current law does not *permit* females to register," Selective Service, *Register*, https://www.sss.gov/register/ (emphasis added). "Permit" conveys the government's view that registering for Selective Service is both a requirement and a privilege.

*White*, *supra*, *see*, *Edmonson v. Leesville*, 500 U.S. 614, 619 (1991) (excluding a person from jury duty based on race denies them the "honor" of participating in the civic service of jury duty).

A new federal hiring program highlights how denying women the opportunity to participate equally in civic life exposes them to even more harm. Described as a "Merit Hiring Plan," federal agencies are now obligated to hire people who express patriotism. Heckman, J., *Governmentwide hiring plan calls on agencies to recruit 'patriotic Americans' into federal workforce*, Federal News Network, May 29, 2025. One of the ways applicants may express patriotism is to write an essay about how they registered for Selective Service. Because of the MSSA's exclusion of women, men can do this, but women cannot. This hiring initiative grew out of an Executive Order issued by President Trump on his first day in office. The Order directs agencies to "prevent the hiring of individuals who are unwilling to defend the Constitution …" This makes the MSSA even more harmful to women because, as this case shows, women want to *challenge* the Constitution precisely *because* it denies them an equal opportunity to *be patriotic*.[32]

Ms. Fenore wants to be called to service if and when a draft is needed. DeSimone, D., *Why 9/11 Inspired These Service Members to Join the Military*, USO.org, Sept. 7, 2021. Selective Service allows men to be conscripted, but not women. This injures Ms. Fenore in her very citizenship because she cannot participate equally in the defense of democracy, a form of government she *should* have an *equal* right – and duty - to serve because this country was created "of the people, by the people, [and] for the people…" Lincoln, A., *Gettysburg Address,* 1863.

---

[32] Ms. Fenore alleges that she has suffered stigmatic injury because the MSSA stereotypes her as less worthy than a man to serve her country. Com.p.5. More specificity is not required at the pleading stage. If this court is inclined to deny standing to Ms. Fenore on the grounds that she has not sufficiently alleged stigmatic harm, she will refile her claims accompanied by an affidavit alleging the myriad ways she has personally experienced stigma.

The Supreme Court recently emphasized that the primary issue in a sex discrimination case is not "what kind of law is being challenged," but rather, does the law treat women differently than men using an "overt gender criterion", *U.S. v. Skrmetti*, 605 U.S. ___ (2025), slip op. at 3. This is the key question because the Equal Protection guarantee ensures equality of "the laws;" not *some* laws - *all* laws, and for all people, not some. Put simply, discriminatory exclusions are injurious for standing purposes (though they may still pass constitutional muster) because they are per se harmful to individuals, entire classes of people, and American Democracy.[33]

### d.    Equal Means Equal and Heroica Foundation Have Standing

Associational standing[34] exists when at least one member of an organization has standing in their own right; the interests the group seeks to protect are germane to its purpose, and neither the claim nor the relief sought require the participation of individual members. *Students for Fair Admissions, supra, at* 182-83  (1st Cir. 2020), *Id*. at 182-83. Equal Means Equal and Heroica have

---

[33] In 2023, a male filed a case like this one, in which he asserted ERA and Fifth Amendment claims. *Valame v. Biden*, No. 5:2023-cv-03018 (N.D. Cal.). The government did not object to Valame's standing, though the issue was briefed after the judge ordered the parties to submit memoranda. *Id*., Doc.61, p.3 & n.2. The judge expressly declined to rule on standing and dismissed Valame's ERA claim on the merits. Because there was no determination that Valame had standing, the court's ruling should be disregarded as it had no jurisdiction to decide the merits. The court also declined to rule on Valame's 5th Amendment claim because he conceded it was "foreclosed by binding precedent." *Id*. at p.3, n.3. The case is now on appeal before the 9th Circuit. *Valame v. Biden*, Docket No. 24-369. The DOJ nowhere argues in its 9th Circuit brief that Valame lacks standing. *Id*., Doc. 28.1. Valame argued before the District Court that he had standing because he refused to register and suffered negative employment consequences. He also claimed stigmatic injury by having to "defend his country on an unequal basis," which made him "anxious about his role in society." *Id.* at p.2. Ms. Fenore's injuries are more serious. She was excluded *by the government*. In addition, she and all women suffer far greater stigmatic injuries. See argument VII b. It would be outrageous *and* discriminatory to grant standing to a man because he chose not to register to *avoid* serving his country, while simultaneously claiming stigma from having *to* serve his country, but then deny standing to a woman because she *tried to register* but was rejected, thus having no opportunity to disobey the law in order to give herself the same standing as a man.

[34] Equal Means Equal and Heroica Foundation assert no organizational standing claim.

been national leaders in the fight for women's equality for many years; two members had their Selective Service applications rejected solely because they are female, Com.p.2,[35] and their participation in this case is not required. This suffices to establish associational standing.[36]

## CONCLUSION

Women have been bleeding to death on the front lines of battle since 2015, but they still cannot register for Selective Service. This discriminates against women *and* subjects them to lethal harm in the defense of American Democracy - without just compensation in the form of legal equality. Women deserve to participate equally in all aspects of military service – and to do so as fully equal persons under the United States Constitution.

Respectfully submitted,

For the Plaintiffs,

/s/ Wendy J. Murphy
WENDY J. MURPHY
Women's and Children's Advocacy Project
Center for Law and Social Responsibility
New England Law | Boston
154 Stuart Street
Boston, MA 02116
BBO#550455
Phone: (617) 422-7410
E-mail: wmurphy@nesl.edu

---

[35] It is worth noting that the National Organization for Women was granted full party standing after intervening in *Idaho v. Freeman* and was authorized to advocate for women as a class simply because the vitality of the ERA was at stake, 625 F.2d 886 (9th Cir. 1980).

[36] If this court rules that all plaintiffs lack standing, Equal Means Equal and Heroica Foundation anticipate that their members will file similar cases in other jurisdictions. Their goal is to give women a primary voice in any Supreme Court case that seeks to overturn *Rostker* and cause women to become eligible for the draft.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record for each party by the ECF filing system.

/s/Wendy J. Murphy