**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

|  |  |  |
|---|---|---|
| EQUAL MEANS EQUAL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:25-cv-10806-WGY |
| | ) | (Leave to file granted 6/17/25) |
| DONALD J. TRUMP, in his official, | ) | |
| capacity as President of the United States, | ) | |
| *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

---

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Last month, in a similar challenge to the constitutionality of the Military Selective Services Act ("MSSA"), the Ninth Circuit affirmed the district court's dismissal of the case for failure to allege a cognizable legal theory. *Valame v. Trump*, No. 24-369, 2025 WL 1983954, at *1 (9th Cir. July 17, 2025). Specifically, the Ninth Circuit "reject[ed] as meritless [the plaintiff's] contention that the Equal Rights Amendment was ratified as the Twenty-Eighth Amendment to the Constitution." *Id.* The opinion was so uncontroversial that the Ninth Circuit handled the matter in a two-paragraph unpublished order. *Id.*

This Court should dismiss this case for the same reason. Plaintiffs' opposition makes clear that they disagree with multiple pronouncements of the Supreme Court on the very issues they seek to litigate. But this Court has no authority to ignore Supreme Court precedent, and certainly has no jurisdiction based on Plaintiffs' asserted generalized interest in "assert[ing] a meaningful voice for women at this critical time of judicial decision-making regarding women's status under the United States Constitution." Compl. ¶ 22, ECF No. 1. Such an interest does not come close to satisfying the requirements for Article III standing. As discussed below, Plaintiffs' opposition brief does not rebut Defendants' showing that this suit should be dismissed.

## ARGUMENT

### I.    Plaintiffs Lack Standing.

Plaintiffs have failed to establish standing.  They seemingly embrace the proposition that the mere existence of a law that "stigmatiz[es]" a plaintiff without more creates a cognizable Article III injury.  Pls.' Opp. to Defs.' Mot. to Dismiss 16-17, ECF No. 11 ("Ms. Fenore clearly suffered [stigmatizing] injuries because the MSSA is replete with sex stereotypes that stigmatize women." (citation modified))  But the Supreme Court has long held that a "stigmatizing injury" alone is insufficient to confer Article III standing.  *Allen v. Wright*, 468 U.S. 737, 755 (1984).  If "abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular [sex] against which the Government was alleged to be discriminating[.]"  *Id.* at 755-56. *See Opiotennione v. Bozzuto Mgmt. Co.*, 130 F.4th 149, 154-156 (4th Cir. 2025) (membership in the disfavored age group by itself insufficient to establish injury in fact, which requires a "particularized injury" that is "personal, individual, distinct, and differentiated" (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) (Kavanaugh, J.)).

Elsewhere, Plaintiffs argue that Fenore has standing because she personally applied for Selective Service registration and "her application was rejected[.]"  ECF No. 11 at 15.  But Plaintiffs fail to explain how that rejection resulted in a concrete Article III injury to Fenore.  "Concreteness and particularization are independent and necessary prerequisites of the injury in fact requirement."  *Town of Milton v. FAA*, 87 F.4th 91, 95 (1st Cir. 2023).  "To be concrete, 'the asserted harm [must have] a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts[.]'"  *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021)).  "'[T]raditional tangible harms, such as physical harms and monetary harms' are 'obvious[ly] concrete."  *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (quoting *TransUnion*, 594 U.S. at 425).  "Intangible harms can also be concrete, including when they 'are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts,' such as 'reputational harms, disclosure of private information, and intrusion upon seclusion.'"  *Id.* (quoting *TransUnion*, 594

U.S. at 425).  The court must analyze whether Plaintiffs "have identified a close historical or common-law analogue for their asserted injury[.]'"  *Id.* (quoting *TransUnion*, 594 U.S. at 424).

As relevant here, a claim of stigmatic injury must also comply with those prerequisites.  "[S]tigmatic injury . . . is [only] judicially cognizable to the extent that" (1) the plaintiff is "personally subject to [the] discriminatory treatment" and (2) the subject of the discriminatory treatment involves "some concrete interest[.]"  *Allen*, 468 U.S. at 757 n.22.  *See Opiotennione*, 130 F.4th at 156 (describing requirements).

Here, even if Fenore's denial satisfies the requirement that an Article III injury be particularized or personal, Plaintiffs fail to explain how it imposes concrete harm on Fenore given that she may voluntarily join the military.  Put differently, Fenore fails to show some concrete interest in being drafted pursuant to MSSA when she can join the military voluntarily subject to the same requirements as those who are drafted.  *See* ECF No. 11 at 15-16.  She invokes no binding authority to support the notion that this injury satisfies Article III's concreteness requirement.  Nor does Plaintiffs' opposition identity a close historical or common-law analogue cause of action under these circumstances.

In discriminatory treatment or exclusion cases where courts have found standing, the interest involved was concrete.  For example, in *Heckler v. Mathews*, 465 U.S. 728 (1984), the denial of a concrete benefit was never in dispute because the named plaintiff was being denied monetary benefits allegedly on a discriminatory basis.  *Id.* at 738; *see also Allen*, 468 U.S. at 757 n.22 (discussing the concrete injury in *Heckler v. Mathews*).  "[A] claim of unlawful exclusion from an existing benefits program can be fit for judicial resolution."  *Dep't of Educ. v. Brown*, 600 U.S. 551, 564 n.1 (2023).  The closest Plaintiffs come to arguing that Fenone has a concrete interest is their suggestion that "Ms. Fenore wants to be called to service if and when a draft is needed."  ECF No. 11 at 18.  But Fenore's denied registration in no way stops her from volunteering for military service in the very circumstance that a draft is needed.  *See Brown*, 600 U.S. at 564 ("It would be quite strange to think that a party experiences an Article III injury by *not* being affected by an unlawful action").

3

To the extent Fenore has experienced emotional distress because only men are permitted to register for the Selective Service, *see* ECF No. 11 at 15-16, "distress at or disagreement with the activities of others is not a basis under Article III for a plaintiff to bring a federal lawsuit challenging the legality of a government regulation allowing [or compelling] those activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 390 n.3 (2024).

Plaintiffs' reliance on *Kyle-LaBell v. Selective Serv. Sys.*, No. 15-5193 (ES) (JAD), 2018 WL 1535230 (D.N.J. Mar. 29, 2018), is unavailing. That case is wrongly decided because it failed to properly find an injury-in-fact, resting instead solely on the plaintiff's inability to register for the draft. 2018 WL 1535230, at *4. The court also relied on language in a Third Circuit opinion stating that "a discriminatory classification is itself a penalty and thus qualifies as an actual injury for standing purposes, where a citizen's right to equal treatment is as stake." 2018 WL 1535230, at *4 (quoting *Hassan v. City of N.Y.*, 804 F.3d 277, 289-90 (3d Cir. 2015)). But the *Hassan* court's expansive statement is directly at odds with Supreme Court precedent holding that "stigmatizing injury" alone is insufficient to convey Article III standing. *Allen*, 468 U.S. at 755. Unsurprisingly, the *Hassan* court relied on benefit denial cases, in which the concrete interests at stake were economic benefits (or the equal opportunity to bid on them). *See Hassan*, 804 F.3d at 289-90 (citing *Saenz v. Roe*, 526 U.S. 489, 505 (1999) and *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 657 (1993) ("*NFCAGCA*")).[1]

---

[1] In *Saenz*, where standing was not in dispute, the plaintiffs challenged a law placing them in a class with reduced monthly welfare benefits, as in *Mathews*. 526 U.S. at 494-96 & n.6. The Court's statement that the California law's "discriminatory classification is itself a penalty" because "the right to travel embraces the citizen's right to be treated equally in her new State of residence" was a statement about the validity, under the Fourteenth Amendment, of the state's discriminatory classification, not the Article III injury of the plaintiffs seeking relief. 526 U.S. at 504-05. In *NFCAGCA*, the defendants contested standing, arguing that it was speculative whether the plaintiffs would have been awarded a contract but for the challenged ordinance giving preferential treatment to minority-owned businesses. 508 U.S. at 664-68. The Court explained that "[t]he 'injury-in-fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* at 666. In those cases, a plaintiff "need only demonstrate" an opportunity injury—"that it is able and ready to bid on contracts and that a

Plaintiffs' footnoted analogy to the harm alleged by a male plaintiff in *Valame v. Biden*, No. 23-cv-03018-NC, 2024 WL 251415 (N.D. Cal. Jan. 20, 2024), is even less apt. ECF No. 11 at 19 n.33. There, a plaintiff alleged that the Government had revoked his job offer after learning of his refusal to register for the Selective Service as required by law. *Valame*, 2025 WL 1983954, at *1. Fenore alleges no such denial of employment on the basis of her registration status, nor could she; Selective Service registration is not a prerequisite to federal employment for women. In any event, the district court's dismissal of Valame's Equal Rights Amendment and Fifth Amendment claims was recently affirmed on the merits by the Ninth Circuit, as noted above. *See id.*

Plaintiffs' opposition also provides no basis to conclude that the organizational Plaintiffs—Equal Means Equal ("EME") and the Heroica Foundation—have standing. ECF No. 11. at 19-20. First, Plaintiffs have waived any argument these Plaintiffs have organizational standing. Memo. of P. & A. in Supp. of Defs.' Mot. to Dismiss, ECF No. 9 at 12-13; ECF No. 11 at 19 n.34. Second, they entirely fail to contest Defendants' argument, ECF No. 9 at 13, that they have not demonstrated associational standing because the Complaint fails to plausibly allege that EME and Heroica Foundation have members possessing indicia of membership in an organization. ECF No. 11 at 19-20. Third, Plaintiffs entirely fail to contest Defendants' argument that they have failed to name at least one injured member of the association in the Complaint, as required by circuit precedent. *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). "[T]he Supreme Court has 'dispensed with' the requirement 'of naming the affected members' only 'where *all* the members of the organization are affected by the challenged activity.'" *Faculty, Alumni, and Students Opposed to Racial Preferences v. Harvard Law Review Ass'n*, No. 18-12105-LTS, 2019 WL 3754023, at *5 n.6 (D. Mass. Aug. 8, 2019) (quoting *Summers v. Earth*

---

discriminatory policy prevents it from doing so on an equal basis." *Id.* But the Court hardly wiped out the longstanding requirement that the plaintiff be able and ready to bid on something concrete. Unlike the city contracts—or the equal opportunity to bid on them—at issue in *NFCAGCA*, this case involves no concrete interest because Fenore faces no concrete barrier to military enlistment.

*Island Institute*, 555 U.S. 488, 498-99 (2009)).  And Plaintiffs claim that only "two members" of EME[2]— not all—have "had their Selective Service applications rejected solely because they are female," ECF No. 11 at 20 (citing Compl. ¶ 1).

Rather than seek to redress an Article III injury, Plaintiffs' opposition makes clear that Plaintiffs seek to vindicate sincere and strong feelings that administration of the Selective Service System is unconstitutional.  *See, e.g.* ECF No. 11 at 20 n.36.  "But that kind of interest does not create standing."  *Carney v. Adams*, 592 U.S. 53, 60 (2020) (referring to a plaintiff who "may feel sincerely and strongly that [certain] laws should comply with the Federal Constitution").  *See also Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (interest in a problem insufficient).

## II.    *Coleman v. Miller* Precludes this Court's Consideration of Plaintiffs' Claims for Relief Premised on the ERA.

As Defendants explained, the relief demanded in the Complaint is foreclosed by the Supreme Court's opinion in *Coleman v. Miller*, 307 U.S. 433 (1939), which prohibits the Judiciary from effectively determining the time period that a constitutional amendment remains open for ratification as well as the efficacy of state ratification redeterminations.  ECF No. 9 at 14-16.  In several footnotes, Plaintiffs seek to downplay or have this Court disregard *Coleman*.  ECF No. 11 at 2 n.1, 3 n.2.  But Plaintiffs provide little substantive justification to ignore the Supreme Court's pronouncements on the very issues necessarily involved in this case.

First, insofar as Plaintiffs are suggesting that Chief Justice Hughes's opinion in *Coleman* is not binding because it was "a plurality ruling[,]" ECF No. 11 at 3 n.2, they are mistaken.  Plaintiffs "overlook[] that Chief Justice Hughes' opinion, announced by Justice Stone, was styled 'Opinion of the Court.'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 804 n.13 (2015) (quoting *Coleman*, 307 U.S. at 435).  And it was so styled for good reason.  Although Chief Justice Hughes' opinion—written for three justices—concludes only that time periods for ratification and the efficacy of state ratification redeterminations may not be decided by the judicial branch, *Coleman*, 307

---

[2] Plaintiffs' opposition refers to no allegations in the Complaint addressing the Heroica Foundation.

6

U.S. at 450-54, the concurring opinion—authored by Justice Black and joined by Justices Frankfurter, Douglas, and Roberts—stated that Congress's exercise of power in this area is beyond judicial review:

> Since Congress has sole and complete control over the amending process, subject to no judicial review, the views of any court upon this process cannot be binding upon Congress . . . .

*Id.* at 459.  Thus, seven justices found that determining time periods for ratification and the efficacy of state ratification redeterminations are outside the purview of the Judiciary.  Accordingly, Chief Justice Hughes' opinion is the "holding of the Court" because it is the "position taken by those Members who concurred in the judgments on the narrowest grounds[,]" *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted), as a majority of the Supreme Court has recognized, *see, e.g.*, *Goldwater v. Carter*, 444 U.S. 996, 1002-05 (1979) (Rehnquist, J., concurring); *id.* at 1001 n.2 (Powell, J., concurring); *Baker v. Carr*, 369 U.S. 186, 214 (1962).

Second, Plaintiffs are wrong to assert that *Coleman* decided "only that Congress has authority to determine the reasonableness of the passage of time between proposal and ratification if an amendment has no deadline."  ECF No. 11 at 3 n.2 (citation modified).  Instead, *Coleman* also addressed limits on Article III power in this area.  And on that critical issue, the Court was clear that "whenever Congress has not exercised th[e] power" "to fix a reasonable time for ratification" Article III courts lack the power to "take upon [themselves] the responsibility of deciding what constitutes a reasonable time and determine accordingly the validity of ratifications."  307 U.S. at 452-53.

True, Congress *did* exercise the power to fix a timeframe for ERA ratification when it promulgated the ERA's ratification deadline.  *See* ECF No. 11 at 3 n.2.  And Defendants agree that nothing in *Coleman* precludes a court from making a judicial pronouncement recognizing the validity of Congress's deadline.  *See id.* (referencing how "several courts have adjudicated the . . . validity of the ERA and its deadline" and upheld it).  But Plaintiffs ask this Court to disregard congressional deadlines and demand that the Court, instead, effectively decide that nearly fifty years—the time it took Virginia to ratify—"constitutes a reasonable time" for ERA ratification.  *See Coleman*, 307 U.S. at 452-53.  But *Coleman* clearly precludes the Judiciary from making that decision.  *Id.*  Thus, the Court

may dispose of Plaintiffs' ERA claims on this basis alone. *Id.* Even if this Court were to find that the congressional deadline had to be revised (which it does not, *see infra* at pp. 10-13), this Court would lack the power to itself decide how long the ERA remains open for ratification under *Coleman*. *Id.*

Third, Plaintiffs' opposition seemingly ignores *Coleman*'s holding regarding state ratification redeterminations. Plaintiffs devote an entire section of their brief to argument that states lack the power to rescind. ECF No. 11 at 8. Undoubtedly, this Court would have to determine that states may not rescind ERA ratifications to issue a judgment declaring that MSSA provisions are "unconstitutional under the ERA[.]" *See id.*; Compl. at 11-12, Prayer for Relief. But *Coleman* is clear that this Court may not determine the "efficacy" of state ratification redeterminations: "[T]he question of the efficacy of ratifications by state legislatures, in the light of . . . attempted withdrawal, should be regarded as a political question[.]" 307 U.S. at 450; *see also White v. Hart*, 80 U.S. 646, 649 (1871) (A State's "den[ial of] the validity of her ratification of [a] constitutional amendment[]" presents a case that is "clearly one in which the judicial is bound to follow the action of the political department of the government, and is concluded by it."). Because *Coleman* and *White v. Hart* preclude this Court from deciding the effectiveness of state ratification redeterminations—and thus that the ERA has become valid as part of the Constitution—the Court may dispose of Plaintiffs' ERA claims on this basis alone as well.

Fourth, Plaintiffs suggest that "language in *Coleman* was . . . dictum[.]" ECF No. 11 at 3 n.2. Even if that were so, this Court is "bound by the Supreme Court's 'considered dicta.'" *United Nurses & Allied Pros. v. NLRB*, 975 F.3d 34, 40 (1st Cir. 2020) (citation omitted). *See also Illinois v. Ferriero*, 60 F.4th 704, 718-19 (D.C. Cir. 2023) (similar). And Plaintiffs do not argue—nor could they—that *Coleman* is anything but "considered."

Moreover, *Coleman*'s holdings in these two areas are not dicta. "[P]ortions of [an] opinion necessary to [its] result" are not dicta. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). And the Court's analysis of these two issues was undoubtedly necessary to its result. On the issue of ratification redeterminations, for example, the *Coleman* Court concluded that the validity of Kansas's ratification

8

of the Child Labor Amendment, after a prior rejection, was a political question by reviewing the ratification history of the Fourteenth Amendment. *Coleman*, 307 U.S. at 448–49. The Court found, for that amendment, that "the political departments of the Government dealt with the effect both of previous rejection and of attempted withdrawal." *Id.* at 449.[3] The Court held that "in accordance with this historic precedent the question of the efficacy of ratifications by state legislatures, in light of previous rejection or attempted withdrawal, should be regarded as a political question." *Id.* at 450. Because the result in *Coleman* was based on the reasoning that rescission after ratification or ratification after rejection present essentially the same issue, *see id.*, the Court's conclusion was not dicta. *See Seminole Tribe of Fla.*, 517 U.S. at 66–67.

The same is true on the issue of the Judiciary's power to determine what constitutes a reasonable time for ERA ratification. Again, the petitioners in *Coleman* contended that Kansas's ratification of the Child Labor Amendment was invalid because it occurred thirteen years after proposal by Congress—a period they contended was longer than permitted under Article V. 307 U.S. at 451-52. The Court concluded that "[w]henever Congress has not exercised that power" to fix a time for ratification, Article III courts may not "take upon [themselves] the responsibility of deciding what constitutes a reasonable time and determine accordingly the validity of ratifications." *Id.* at 452-53. It explained that doing so "would be an extravagant extension of judicial authority[.]" *Id.* at 454. Because these statements constitute the Court's rationale for its decision, they are not dicta. *Seminole Tribe of Fla.*, 517 U.S. at 66-67. That this case involves a plaintiff seeking judicial validation—of Virginia's ratification nearly fifty years after Congress proposed the ERA—rather than invalidation of a state's ratification does not undermine the binding effect of the *Coleman* Court's reasoning on this Court. *See* ECF No. 11 at 3 n.2; *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) ("Every case can be limited to its facts and distinguished from later ones." That alone provides "no cogent reason" for failing to follow binding authority.).

---

[3] The Court explained that "Ohio and New Jersey first ratified and then passed resolutions withdrawing their consent." *Coleman*, 307 U.S. at 448.

III.    **Plaintiffs Fail to State a Claim for Relief.**

Even if this Court were inclined to reach the merits of the claims in Plaintiffs' Complaint, dismissal would remain appropriate on the basis of dispositive issues of law. To credit Plaintiffs' ERA claim would require the Court to ignore Congress's ratification deadlines and binding Supreme Court precedent. And Plaintiffs' equal protection claim is foreclosed by *Rostker v. Goldberg*, 453 U.S. 57, 83 (1981), as multiple Courts of Appeal have recently confirmed.

A.    **The ERA's Ratification Deadlines Preclude Any Claim that MSSA Provisions Violate the ERA.**

Plaintiffs' arguments that the ERA has been adopted despite the expiration of Congress's clear ratification deadlines are meritless.

Plaintiffs first try to undermine the Supreme Court's recognition in *Dillon v. Gloss* that Congress can set ratification deadlines incident to its authority to control the "mode of ratification" of a proposed constitutional amendment. ECF No. 11 at 3-5. They characterize *Dillon* as dictum. *Id.* at 3. "But as the [Supreme] Court itself has explained, 'while the language used in [*Dillon*] was not in the strict sense necessary to a decision, it is evident that [A]rticle [V] was carefully examined and that the Court's statements with respect to the power of Congress in proposing the mode of ratification were not idly or lightly made." *Illinois v. Ferriero*, 60 F.4th 704, 718 (D.C. Cir. 2023) (quoting *United States v. Sprague*, 282 U.S. 716, 732-33 (1931)). Indeed, in *Coleman*, the Court rejected the notion that *Dillon*'s pronouncements were dicta. 307 U.S. at 452 (citing *Dillon*, 256 U.S. at 374-76) ("We have *held* that the Congress in proposing an amendment may fix a reasonable time for ratification.").

Nor does the Twenty-Seventh Amendment's success diminish the force of *Dillon*'s import or of Congress's deadlines here, as Plaintiffs would have it. ECF No. 11 at 3-4 (arguing that *Dillon* is "not good law" in light of the Twenty-Seventh Amendment). Contrary to the express congressional ratification deadlines for the ERA, Congress simply declined to impose a ratification deadline for the Twenty-Seventh Amendment. 1 Stat 97 (1789). Congress's judgment that the Twenty-Seventh Amendment did not require a limited period for ratification does not detract from *Dillon*'s reasoning

that Congress is entitled to set one if it chooses.[4]  Congress has the authority to decide what is reasonable when proposing a constitutional amendment, *Dillon*, 256 U.S. at 375-76, and has done so here.

Any doubt about *Dillon*'s relevance, or the Supreme Court's determinations on the precise question presented by Plaintiffs here, is removed by the Supreme Court's later decision with respect to the ERA itself. At the Solicitor General's request, *see* Mem. for Adm'r of Gen. Servs. Suggesting Mootness at 3, *Nat'l Org. for Women, Inc. v. Idaho*, No. 81-1282 et al. (U.S. July 9, 1982), the Supreme Court previously dismissed as moot the Government's appeal of a district court's determination that Idaho's rescission of its ERA ratification was valid. *See Nat'l Org. for Women, Inc. v. Idaho*, 459 U.S. 809, 809 (1982). That holding was necessarily predicated on the deadline's expiration, which left no live dispute to resolve. *Id.*; *see also Ratification of the ERA*, 44 Op. OLC 1, 23 (Jan. 6, 2020). Had it been otherwise, the Government's appeal from the district court's declaratory judgment that Idaho's rescission nullified its prior ratification would have remained necessary for the Supreme Court to review in 1982.  Accordingly, even without *Dillon*, Plaintiffs' claims here fail.

Nor is the deadline itself "invalid because it [purportedly] disrupts the balance of power between Congress and the States."  ECF No. 11 at 4.  Article V "is a grant of authority by the people to Congress."  *Sprague*, 282 U.S. at 733.  And, again, "Article V confers upon Congress" power to address matters of detail that "flows from its power to designate the 'mode of ratification,' including the establishment of a reasonable time limit for ratification."  *Illinois*, 60 F.4th at 717 (quoting *Dillon*, 256 U.S. at 376).  The Tenth Amendment, *see* ECF No. 11 at 4, does not limit "the people's delegation by article 5 of certain functions to the Congress."  *Sprague*, 282 U.S. at 734.[5]

---

[4] Resolving any plausible doubt on Congress's view that the Twenty-Seventh Amendment was ratified within a reasonable period of time, the House and Senate passed separate versions of concurrent resolutions addressing the amendment's validity in 1992.  *See* H.R. Con. Res. 320, 102d Cong. (1992); S. Con. Res. 120, 102d Cong. (1992).

[5] Plaintiffs' views about the wisdom of Congress's historical use of regulating the mode of ratification, ECF No. 11 at 7 (arguing that "Congress' handling of deadlines has been arbitrary"), has no bearing on Congress's constitutional authority to regulate the mode by imposing a deadline.

Plaintiffs also wrongly contend that the location of the deadline renders it meaningless, in a further attempt to distinguish *Dillon*. ECF No. 11 at 5-8 & n.8. Their argument that Congress's discretion to place a deadline in a preamble cannot "be derived from Congress' authority to determine the mode of ratification," *id.* at 6, is directly contrary to the Supreme Court's conclusion that Congress's power to set deadlines is "an incident of its power to designate the mode of ratification." *Dillon*, 256 U.S. at 376; *Illinois*, 60 F.4th at 717 (rejecting the same argument).

And Plaintiffs' discussion of Article V fails to grapple with its text. *See* ECF No. 11 at 5-8. Plaintiffs suggest that Article V grants Congress only the power to "determine" one of two "mode[s] of ratification" when proposing amendments. *See id.* at 6. But Article V states that Constitutional amendments are valid "when ratified by the legislatures of three fourths of the several states, or by conventions in three fourths thereof, *as* the one or the other Mode of Ratification may be proposed by the Congress[.]" U.S. Const. art. V. (emphasis added). The language—"*as* the one or the other may be proposed by the Congress"—suggests expansive authority to regulate the chosen mode, not a procedural and technical straightjacket to decide one mode or the other and nothing more about incidental matters associated with the mode, as Plaintiffs would have it. *See Dillon*, 256 U.S. at 376. Indeed, at the Founding, the word "as" was defined as "[i]n the manner that[.]" *As*, Samuel Johnson, A Dictionary of the English Language (10th ed. 1792). The language plainly vests Congress with broad authority to regulate the manner of ratification by state legislatures or state conventions, as *Dillon* explains.

Plaintiffs are wrong to argue prefatory language to a proposed constitutional amendment has no operative effect. ECF No. 11 at 6. Rather, the prefatory clause has always set out Congress's preferred mode of ratification. *See Ratification of the ERA* at 14. And, as *Dillon* concluded, a ratification deadline is a regulation inexorably intertwined with the chosen mode. *Dillon*, 256 U.S. at 376. Indeed, "[t]he proposing clause for the Bill of Rights not only specified the mode of ratification but also contained a procedural instruction authorizing the state legislatures either to ratify 'all' twelve proposed articles or to ratify 'any of' them individually." *Ratification of the ERA* at 16 (citing 1 Stat. at 97). "This

12

proposing clause was debated by the House and the Senate and considered of a piece with the substantive proposed amendments." *Id.* (citing 4 *Documentary History of the First Federal Congress of the United States of America* 35–45 (Charlene Bangs Bickford & Helen E. Veit eds., 1986)).  Plaintiffs' "argument that the proposing clause is akin to the inoperative prefatory clause in a bill is unpersuasive, not just because proposed constitutional amendments are not 'ordinary cases or legislation' . . . but also because if that were the case, then the specification of the mode of ratification in every amendment in our nation's history would also be inoperative." *Illinois*, 60 F.4th at 719.

Indeed, "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). And here Congress has included ratification deadlines in proposed constitutional amendments for more than 100 years, *see* U.S. Const. amend. XVIII, § 3, and has included the deadline in the proposing clause since 1960, *see* 74 Stat. 1057 (1960) (23rd Amendment), largely to avoid "clutter[ing] up the Constitution with vestigial ratification deadlines, *see* 101 Cong. Rec. 6628 (1955) (Sen. Kefauver).  The fact that Congress included language about the effective date of the ERA in its proposed text rather than the proposing clause, ECF No. 11 at 7 n.11, is of no import.

Furthermore, there is no basis for Plaintiffs' argument that Congress's decision to place a ratification deadline in the proposing clause rather than the proposed text renders it invalid because "imposing a deadline []on the States is a substantive act that restricts them."  ECF No. 11 at 6. Whether in the text or in the proposing clause, States receive ample notice of the deadline by which they may ratify a proposed amendment.  *See* Lawrence H. Tribe, Comment, *A Constitution We Are Amending: In Defense of a Restrained Judicial Role*, 97 Harv. L. Rev. 433, 445 (1983) (Acknowledgment of Congress's authority under Article V "demands judicial deference to procedural provisions that Congress writes into the resolutions by which it proposes amendments for ratification no less than to procedural provisions that Congress inserts into the texts of the proposed amendments themselves.").

13

**B. Plaintiffs' Equal Protection Claim is Foreclosed by *Rostker*.**

Plaintiffs evidently disagree with the Supreme Court's opinion in *Rostker v. Goldberg*, 453 U.S. 57 (1981), which rejected an equal protection-based challenge to the MSSA.  ECF No. 11 at 14-15. But this Court cannot overturn Supreme Court precedent.  *See, e.g., Lawyers United Inc. v. United States*, No. 1:19-CV-3222-RCL, 2020 WL 3498693, at *5 (D.D.C. June 29, 2020) ("Quite simply, the Court must follow controlling precedent until that precedent is directly overturned.").

Plaintiffs are wrong to argue that this Court can disregard *Rostker* because "facts underlying *Rostker*" purportedly have "changed[.]"  ECF No. 11 at 14.  In *Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6 (1st Cir. 2011), Judge Stahl rejected this exact argument.[6]  The *Elgin* plaintiffs argued "that *Rostker* is no longer good law . . . due to dramatic changes in the roles of women in the military."  641 F.3d at 22 (Stahl, J., concurring).  As Judge Stahl explained, "changes in the military" do not undermine "principles of stare decisis" that "mandate the finding that *Rostker* is controlling and that plaintiffs' claim[s] are meritless."  *Id.*; *see also id.* at 24 ("[I]t would not be for this court to determine what, if any, impact these [factual] developments had on the continued vitality of *Rostker*, a task left solely to the Supreme Court."); *Valame*, 2025 WL 1983954, at *1 (similar); *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549-50 (5th Cir. 2020) ("[T]he factual underpinning of the controlling Supreme Court decision has changed, but that does not grant a court of appeals license to disregard or overrule that precedent."), *cert. denied*, 141 S. Ct. 1815, 1816 (2021) (Sotomayor, J., respecting the denial) (denying certiorari despite observing that "[t]he role of women in the military has changed dramatically since [*Rostker*]").

**CONCLUSION**

For the foregoing reasons, the Court should dismiss this action.

Dated: August 18, 2025                          Respectfully submitted,

___

[6] The majority concluded that the court lacked subject matter jurisdiction and did not address the equal protection issue.  *Elgin*, 641 F.3d at 13.  The Supreme Court granted certiorari and affirmed the majority's opinion that district court jurisdiction was precluded by the Civil Service Reform Act. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012).

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel

*/s/ Liam C. Holland*
LIAM C. HOLLAND B.B.O. #704799
ANDREW J. RISING
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Tel.: (202) 514-4964
Fax: (202) 616-8470
Email: Liam.C.Holland@usdoj.gov

*Counsel for Defendants*

15